*Appeal No. 12-5331*

IN THE

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

———— ▸▸◂◂ ————

CAROLYN JUREWICZ; THE HUNTE CORPORATION;
MISSOURI PET BREEDERS ASSOCIATION; SHARON LAVY,

*Plaintiffs-Appellants,*

*v.*

UNITED STATES DEPARTMENT OF AGRICULTURE,

*Defendant-Appellee,*

*and*

HUMANE SOCIETY OF THE UNITED STATES,

*Intervenor for Defendant-Appellee.*

————————

*On Appeal from the United States District Court
for the District of Columbia*

## BRIEF FOR PLAINTIFFS-APPELLANTS

Ira T. Kasdan
Laurence J. Lasoff
Stephen R. Freeland
Elizabeth C. Johnson
KELLEY DRYE & WARREN LLP
*Attorneys for Plaintiffs-Appellants*
Washington Harbour, Suite 400
3050 K Street, NW
Washington, DC 20007
202-342-8400

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), Appellants state as follows:

**A.** **Parties**.  Plaintiffs below, and Appellants in this Court, are:

Carolyn Jurewicz

The Hunte Corporation

The Missouri Pet Breeders Association

Sharon Lavy

Defendant below, and Appellee in this Court, is:

United States Department of Agriculture

Intervenor-Defendant below, and Appellee in this Court, is:

The Humane Society of the United States

No *amici* appeared in the District Court or have appeared in this Court..

**B.** **Rulings Under Review**.  Appellants appeal the following district court ruling:

*Jurewicz, et al. v. Dep't of Agriculture*, No. 10-1683, Order Denying Plaintiff's Motion for Summary Judgment, Granting Defendant's and Defendant-Intervenor's Motions for Summary Judgment, and Granting Judgment in Favor of Defendant and Intervenor-Defendant (Sept. 20, 2012) (Docket No. 61).

**C.** **Related Cases**.  This case has not previously been appealed to this or any other Court.  Counsel is not aware of any related cases pending in any court.

## CERTIFICATE OF COUNSEL

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, Appellants state as follows:

The Hunte Corporation has no parent companies, nor is there any publicly-held company that has a 10% or greater ownership interest (such as stock or partnership shares) in The Hunte Corporation.

The Missouri Pet Breeders Association has no parent companies, nor is there any publicly-held company that has a 10% or greater ownership interest (such as stock or partnership shares) in the Missouri Pet Breeders Association.

    /s/ Ira T. Kasdan
Ira T. Kasdan
KELLEY DRYE & WARREN LLP
3050 K Street, N.W., Suite 400
Washington, D.C.  20007
(202) 342-8400 (phone)
(202) 342-8451 (facsimile)
Email:  ikasdan@kelleydrye.com

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ......................................................1

STATEMENT OF ISSUES PRESENTED.......................................1

STATEMENT OF THE CASE...................................................4

STATEMENT OF FACTS ........................................................5

SUMMARY OF THE ARGUMENT ........................................10

ARGUMENT ..............................................................................13

I.     STANDARD OF REVIEW ..............................................13

II.   THE BOX 8 (OR 10) INFORMATION IS EXEMPT FROM
      DISCLOSURE UNDER EXEMPTION 6.....................................14

    A.   Licensees Have A Substantial Privacy Interest In The Box 8
        (Or 10) Information .................................................15

    B.   There Are No Valid Public Interests In Disclosure Of The Box
        8 (or 10) Information .................................................17

        1.   There Are No Valid Public Interests in Disclosure of the
             Gross Revenue Information ........................................17

             a.   Disclosure of the Gross Revenue Information Will
                 Not Serve the Public's Interest in Determining
                 Whether USDA Fees are Reasonable and
                 Equitable ......................................................18

             b.   Disclosure of the Gross Revenue Information Will
                 Not Serve the Public's Interest in Evaluating
                 Whether USDA is Properly Assessing and
                 Collecting Fees ........................................... 22

        2.   There Is No Valid Public Interest in Disclosure of the
              Business Volume Information ....................................25

             a.   The Record Does Not Support the Argument that
                 the *Public* Can Compare Form 7003 Data With
                 Inspection Report Data ...............................25

             b.   No Meaningful Comparisons Can Be Drawn
                 Between Form 7003 Data and Inspection Report
                 Data.............................................................27

C.    USDA's Balancing Of The Private And Public Interests Was
      Erroneous..........................................................................................30

      1.    USDA Failed to Give Sufficient Weight to Licensees'
            Privacy Interest .....................................................................30

            a.    USDA Arbitrarily Diminished Licensees' Privacy
                  Interest in Their Gross Revenue Information.................31

            b.    USDA Arbitrarily Diminished Licensees' Privacy
                  Interest in Their Business Volume Information.............32

                  (1)    Business Volume Information Sheds Light
                         on the Personal Finances of Licensees.................33

                  (2)    Public Availability of Inspection Report
                         Data Does Not Reduce Licensees' Privacy
                         Interest in Their Business Volume Data ..............34

      2.    USDA Gave Too Much Weight to the Purported Public
            Interests ..................................................................................37

            a.    USDA Gave Too Much Weight to the Purported
                  Public Interest Relating to The Assessment and
                  Collection of Licensing Fees ..........................................38

            b.    USDA Gave Too Much Weight to the Purported
                  Public Interest Relating to Inspections and
                  Enforcement Actions .......................................................39

            c.    Alternative Sources of Information Exist Which
                  Diminish the Public Interests..........................................40

D.    In The Alternative, Procedural Defects Require A Remand To
      USDA ................................................................................................43

      1.    USDA's Analysis of Licensees' Privacy Interest Was
            Defective ..................................................................................43

            a.    USDA Failed to Explain Why Licensees' Privacy
                  Interest in Their Gross Revenue Information Was
                  "Limited" .........................................................................43

            b.    USDA Impermissibly Failed to Consider How Box
                  8 (or 10) Information Would Be Used in Its
                  Privacy Analysis ..............................................................45

      2.    USDA's Analysis of The Public Interests Was Defective........49

III.    THE BOX 8 (OR 10) INFORMATION IS EXEMPT FROM
        DISCLOSURE UNDER EXEMPTION 4.......................................................51

        A.    Non-Competitors Can Cause "Competitive Harm" For Purposes
              Of Exemption 4 ....................................................................................52

        B.    USDA Arbitrarily Discounted The Harm Licensees Would
              Suffer By The Release Of The Box 8 (or 10) Information Based
              On The Public Availability Of Other Information.............................57

IV.     THE BOX 8 (OR 10) INFORMATION SHOULD BE
        CATEGORICALLY EXEMPT UNDER FOIA ...........................................59

V.      CONCLUSION.............................................................................................59

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*,
   419 U.S. 281 (1974)..................................................................20, 24, 27

*CNA Financial Corp. v. Donovan*,
   704 F.2d 1280 (D.C. Cir. 1983).........................................................53

*\*Consumers' Checkbook Center for the Study of Servs. v. U.S. Dep't of
   Health & Human Servs.*,
   554 F.3d 1046 (D.C. Cir. 2009)................................. 13-18, 20, 29-32, 38-39, 44

*Critical Mass Energy Project v. NRC*,
   975 F. 2d 871 (D.C. Cir. 1992).........................................................59

*Florida Power & Light Co. v. Lorion*,
   470 U.S. 729 (1985).......................................................................14

*Hopkins v. HUD*,
   929 F.2d 81 (2d Cir. 1991) ............................................................ 36-37

*Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*,
   463 U.S. 29 (1983)........................................................................13

*\*Multi Ag Media LLC v. Dep't of Agric.*,
   515 F.3d 1224 (D.C. Cir. 2008).................................15-17, 33-34, 40

*Nadler v. F.D.I.C.*,
   92 F.3d 93 (2d Cir. 1996) ...............................................................55

*Nadler v. F.D.I.C.*,
   899 F. Supp. 158 (S.D.N.Y. 1995) ............................................. 55- 56

*Nat'l Archives and Records Admin. v. Favish*,
   541 U.S. 157 (2004)...............................................................24, 29, 49

*Authorities upon which we chiefly rely are marked with asterisks.

*Nat'l Ass'n of Retired Fed. Employees v. Horner,
879 F.2d 873 (D.C. Cir. 1989)...............................................14-15, 30, 45, 47-48

Nat'l Org. for Women v. Social Sec. Admin. of Dept. of Health and Human
Servs., 736 F.2d 727 (D.C. Cir. 1984) ........................................... 49-50

Nat'l Wildlife Fed'n v. Costle,
629 F.2d 118 (D.C. Cir. 1980)..................................................... 13-14

Nation Magazine, Washington Bureau v. U.S. Customs Serv.,
71 F.3d 885 (D.C. Cir. 1995)...............................................................35

Occidental Petroleum Corp. v. SEC,
873 F. 2d 325 (D.C. Cir. 1989)....................................................36, 51

*Painting & Drywall Work Pres. Fund, Inc. v. HUD,
936 F.2d 1300 (D.C. Cir. 1991)................................... 36-37, 40, 44, 58

Public Citizen Health Research Group v. FDA.
830 F.2d 1154 ........................................................................53

*United Techs. Corp. v. U.S. Dep't of Def.,
601 F.3d 557 (D.C. Cir. 2010).........................................13, 45, 53, 57

San Juan Cellular Tel. Co. v. Public Service Comm'n of Puerto Rico,
967 F.2d 683 (1st Cir. 1992).............................................................21

Swan v. S.E.C.,
96 F.3d 498 (D.C. Cir. 1996)...........................................................48

Taylor Energy Co. LLC v. U.S. Dep't of the Interior,
734 F.Supp.2d 112 (D.D.C. 2010)......................................................51

U.S. Dep't of Def. v. Fed. Labor Relations Auth.,
510 U.S. 487 (1994)............................................................... 23-24, 28

U.S. Dep't of Def. Dep't of Military Affairs v. Fed. Labor Relations Auth.,
964 F.2d 26 (D.C. Cir. 1992).............................................................41

Washington Post Co. v. U.S. Dept. of Agric.,
943 F.Supp. 31 (D.D.C. 1996).........................................................48

STATUTES

5 U.S.C. § 552 ......................................................................................................1

5 U.S.C. § 552(b)(4)......................................................................................3, 51, 55

5 U.S.C. § 552(b)(6)......................................................................................3, 14, 30

7 U.S.C. § 2153 ....................................................................................................21

28 U.S.C. § 1291 ..................................................................................................1

28 U.S.C. § 1331 ..................................................................................................1

5 U.S.C. § 701, *et seq*.........................................................................................1

OTHER AUTHORITIES

9 C.F.R. § 2.6 .............................................................................................10, 19, 22, 57

Fed. R. App. Proc. 30(c)(2)(a) ...................................................................................5

Radez, The Freedom of Information Act Exemption 4: Protecting Corporate
    Reputation In the Post-Crash Regulatory Environment, 2010 Colum. Bus.
    L. Rev. 632 (2010) ...........................................................................................54

Connelly, Secrets and Smokescreens: A Legal and Economic Analysis of
    Government Disclosures of Business Data, 1981 WIS.L.REV. 207 ........... 53-54

# <u>GLOSSARY</u>

APHIS – Animal and Plant Health Inspection Service

FOIA – Freedom of Information Act

HSUS – The Humane Society of the United States

MPBA – Missouri Pet Breeders Association

USDA – The United States Department of Agriculture

# JURISDICTIONAL STATEMENT

The United States District Court of the District of Columbia ("District Court") had jurisdiction over this case under the Administrative Procedure Act (5 U.S.C. §§ 701, et seq.) ("APA"), pursuant to 28 U.S.C. § 1331.  The District Court issued its Order granting Summary Judgment to the Defendant-Appellee the United States Department of Agriculture ("USDA") and Defendant-Intervenor-Appellee the Humane Society of the United States ("HSUS") (collectively, "Appellees") on September 20, 2012.  Plaintiffs-Appellants Caroline Jurewicz, The Hunte Corporation, the Missouri Pet Breeders Association ("MPBA"), and Sharon Lavy (collectively, "Appellants" or "Licensees") timely filed their notice of appeal on October 16, 2012.  This Court's jurisdiction rests on 28 U.S.C. § 1291.

# STATEMENT OF ISSUES PRESENTED

1.  Should USDA's decision to release under the Freedom of Information Act (5 U.S.C. § 552) ("FOIA")[1] Appellants' personal and private information in dispute here that is found on Box 8 (or 10) of USDA Form 7003 (hereinafter "Box 8 (or 10) information"), be set aside as arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law under the APA, and

---

[1]     5 U.S.C. § 552 is set out in full, along with other pertinent statutes and regulations pertinent, in the Addendum at the end of this brief.

1

should summary judgment be entered in favor of Appellants, because USDA's decision is not adequately supported by record evidence?

2.    Should USDA's decision to release the Box 8 (or 10) information under FOIA be set aside as arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law under the APA, and should the matter be remanded to USDA, because its decision relied upon crucial facts and reasons without providing Appellants notice and an opportunity to respond to those facts and reasons?

3.    Should USDA's decision to release the Box 8 (or 10) information under FOIA be set aside as arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law under the APA, and should the matter be remanded to USDA, because its decision failed to substantively review and take into consideration  relevant facts raised in the record by Appellants and others?

4.    Should USDA's decision to release the Box 8 (or 10) information be set aside as arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law under the APA, and should summary judgment be entered in favor of Appellants, because there is no significant public interest, if any public interest at all, in the release of the Box 8 (or 10) information – the Appellees not having met their burden to have demonstrated a public

interest, let alone a significant one – such that the Box 8 (or 10) information should be exempt from disclosure under 5 U.S.C. § 552(b)(6) ("Exemption 6")?

5.    Should USDA's decision to release the Box 8 (or 10) information be set aside as arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law under the APA, and should summary judgment be entered in favor of Appellants, because USDA improperly balanced the private and public (if any) interests in its decision to release the Box 8 (or 10) information, such that the private interest in non-disclosure outweighed any public interest in disclosure and the Box 8 (or 10) information should be exempt from disclosure under Exemption 6?

6.    Whether "confidential" information under 5 U.S.C. § 552(b)(4) ("Exemption 4") is limited to information which is requested, and can be used, only by "competitors" of the party whose information has been requested, and if not, as Appellants assert, whether USDA's decision to reject Appellants' argument that the release of the Box 8 (or 10) information would cause substantial competitive harm to the persons from whom the information was obtained by USDA was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law under the APA, such that summary

judgment should be entered in favor of Appellants exempting the disclosure of the Box 8 (or 10) information under Exemption 4.

7.    Whether, as Appellants assert, the release of information which is sought for the purpose of harming a person's business and causing the demise of the person's business, qualifies as causing substantial competitive harm to the person from whom the information was obtained, and whether USDA's failure to so find and conclude rendered its decision not to exempt the Box 8 (or 10) information under Exemption 4 arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law under the APA, such that summary judgment should be entered in favor of Appellants.

8.    Whether the Box 8 (or 10) information, as well as all similar information found on USDA Form 7003, is categorically exempt from disclosure as a matter of law under Exemption 6 and/or Exemption 4.

## **STATEMENT OF THE CASE**

Licensees brought suit in the District Court, contesting USDA's release under FOIA of their private and confidential information found on USDA license renewal application and annual report, Form 7003. *See, e.g*., Appellant Lavy's Form 7003 (A.R. 000450). Specifically, Licensees object to the release of the Box 8 (or 10) information on Form 7003, which consists of (1) the total number of animals purchased and sold by a licensee in the prior business year ("business

volume information"); and (2) the annual gross revenue resulting from such transactions ("gross revenue information"). In response to three separate FOIA requests by HSUS, USDA originally withheld the Box 8 (or 10) information as exempt from disclosure under Exemptions 4 and 6. However, USDA subsequently reversed its position and decided to disclose this information in full.

On cross-motions for summary judgment, the District Court entered summary judgment in favor of Appellees. After Licensees appealed, this Court denied USDA's Motion for Summary Affirmance and ordered full briefing.

## STATEMENT OF FACTS

### HSUS' FOIA Requests, Administrative Appeal, and Lawsuit

This case relates to three separate FOIA requests that HSUS filed with USDA seeking copies of Form 7003 documents. The first two requests targeted specifically-named licensees, including Appellant Hunte, while the third request broadly sought the Form 7003 information for all breeders and dealers in Missouri, including Appellants Jurewicz and Lavy and members of Appellant MPBA. A.R. 000001-000004, 000024-000027, 000164-000166.[2] In response to these requests, USDA redacted Box 8 (or 10) information as "personal financial data" exempt from disclosure under Exemption 6, A.R. 000019, 000702, and/or "privileged or

---

[2]     Because a deferred appendix will be utilized in this case, all citations to the record in this brief are, pursuant to Fed. R. App. Proc. 30(c)(2)(a), to the Administrative Record ("A.R.").

5

confidential commercial, financial or trade secret information" under Exemption 4. A.R. 000702.

HSUS administratively appealed USDA's conclusion that the Box 8 (or 10) information was exempt from disclosure under Exemption 4 or 6. A.R. 000975-000990. Licensees, however, were not at that time informed either of HSUS' original FOIA requests nor of HSUS' appeal. While its administrative appeal was pending, HSUS filed a lawsuit against USDA seeking to compel production of the redacted information. A.R. 000991-001005.

**USDA's Reversal of Its Position**

In November 2010, after HSUS had filed its complaint against USDA, USDA wrote to Licensees notifying them of HSUS' FOIA requests and the then-pending HSUS lawsuit. A.R. 001006-001007; 001008-001009. USDA went on to write that "[t]his notice seeks your company's position on whether the enclosed form or forms contain confidential business information ('CBI') exempt from disclosure under the FOIA." A.R. 001006, 001008; *see also* A.R. 001007 ("explain how release of this information would cause **substantial competitive harm to your business**") (emphasis in original).

After receiving comments from breeders and dealers, USDA issued a letter determination in March 2011 ("March 2011 Decision") completely reversing its initial holding that the Box 8 (or 10) information was not exempt from disclosure,

6

and concluding that it should be released in full. A.R. 004550-004556. The only FOIA exemption USDA analyzed in this Decision was Exemption 4. USDA concluded that it was "unable to identify substantial competitive harm that will result from release of [Box 8 (or 10)] information," A.R. 004555, basing its opinion, in part, on information purportedly obtained from the American Kennel Club (the "AKC"). A.R. 004554.

**Licensees' Lawsuit and USDA's Voluntary Remand**

In April 2011, Licensees filed this reverse-FOIA action seeking to set aside USDA's March 2011 Decision. *See generally* Complaint (Dkt. 1 in Case No. 1:11-cv-00707-JEB); Amended Complaint (Dkt. 29 in Case No. 1:10-cv-01683-JEB).[3]

After Licensees complained that USDA mischaracterized the position of the AKC in its March 2011 Decision, *see* Second Amended Complaint (Dkt. 42) ¶¶ 75-78, and Exhibit G thereto, USDA moved to voluntarily remand the case back to USDA. *See* Motion for Voluntary Remand (Dkt. 34). The District Court granted the Motion. *See* Dec. 9, 2011 Minute Order. Shortly thereafter, USDA forwarded to Licensees' counsel a letter addressed to breeder/dealer licensees requesting comments on whether their information should be disclosed to HSUS. A.R. 005075-005076. This letter did not discuss any FOIA exemption; rather, it stated

---

[3]     Unless otherwise noted, all further citations to the Docket ("Dkt. __") refer to the docket in Case No. 1:10-cv-01683-JEB, into which Licensees' lawsuits were consolidated with HSUS'.

generally: "APHIS will consider comments previously submitted, as well as additional comments submitted by Plaintiffs regarding the information at issue." A.R. 005075.

## USDA's Final Decision

After receiving approximately 180 comments, USDA issued a final decision dated February 17, 2012, in which it concluded that the Box 8 (or 10) information was not exempt from disclosure under Exemptions 3, 4 or 6 (the "Final Decision"). A.R. 005525-005537.

With respect to Exemption 6, USDA found that Licensees have a "limited, cognizable privacy interest in their personal financial information," but stated that "the privacy interest is lessened because the information shows only the gross income and not net profit after operating expenses are considered; therefore it does not provide a complete picture of the individual's finances." A.R. 005529. USDA found that Licensees' privacy interest in their business volume information – which would reveal the size of a licensee's operation – was "much weaker." *Id.*

USDA also enunciated three "public interests" favoring disclosure:

- "Members of the public can use the gross dollar amount from regulated activities to analyze whether the agency is properly assessing fees in accordance with its regulations." A.R. 005531.

- "[M]embers of the public can determine whether the agency is fulfilling the mandate of Congress to 'charge, assess, and cause to be collected reasonable fees [which] shall be adjusted on an equitable

basis taking into consideration the type and nature of the operations to be licensed.'" *Id.*

- "[A]ny discrepancies between the information on Form 7003 [*i.e.*, the business volume data] and the publicly available information on the inspection reports [*i.e.*, the total number of animals, as observed by an inspector, on a licensee's premises on a single inspection day] will shed light on the agency's performance of its enforcement duties under the Animal Welfare Act." *Id.*

In support of this third public interest, USDA relied primarily on a February 15, 2012 E-mail from Dr. Betty Goldentyer, APHIS' Eastern Regional Director, to Anastasia Taylor, APHIS' FOIA Project Manager (A.R. 005538) ("Goldentyer E-mail").

Applying a balancing test, USDA found that these public interests – which had never before been presented to Licensees, and in fact were identified for the first time in the Final Decision – outweighed Licensees' "minimal" and "negligible" privacy interest in their gross revenue and business volume information. Accordingly, USDA concluded that Exemption 6 did not protect Licensees' private business information from disclosure. A.R. 005531.

With respect to Exemption 4, USDA held that release of the Box 8 (or 10) information would not constitute "substantial competitive harm" to Licensees. A.R. 005535. USDA recognized that the Box 8 (or 10) information would reveal the size of a Licensee's operation, but found no competitive harm that would result from disclosure of this information because, according to USDA, this information

was already publicly available.  *Id*.  With regard to the gross revenue information, the agency claimed that it "routinely releases the amount of fees that it charges a particular business," and that this "information, combined with USDA's regulations at 9 C.F.R. § 2.6, reveals a range of gross dollar amounts derived from regulated activities."  *Id*.  With regard to the business volume information, USDA claimed that a Licensee's one-day inventory of animals, as reflected on APHIS inspection reports, was enough to consider the business volume information publicly available.  A.R. 005536.  Accordingly, USDA announced its intention to release each of Licensees' Form 7003 to HSUS without any of the Block 8 (or 10) information redacted.  A.R. 005537.

**Licensees' Second Amended Complaint and The District Court's Order**

Pursuant to the District Court's Dec. 9, 2011 Minute Order, Licensees filed a Second Amended Complaint to reverse USDA's Final Decision.  On cross-motions for summary judgment, the District Court entered summary judgment in favor of USDA and HSUS.  *See* Sep. 20, 2012 Order (Dkt. 61) and Memorandum Opinion ("Mem. Op.") (Dkt. 62).  This appeal followed.

## SUMMARY OF THE ARGUMENT

Licensees challenge USDA's and the District Court's determination that the Box 8 (or 10) information is not exempt from disclosure under Exemptions 4 and 6.

10

With respect to Exemption 6, USDA's conclusion that the Box 8 (or 10) information is not exempt from disclosure is arbitrary and capricious for several reasons. First, the purported public interests proffered by USDA would not be served by disclosure of the Box 8 (or 10) information, and otherwise are not supported by the record before the agency; thus, USDA never should have engaged in a balancing test at all. Second, even if the purported public interests are valid, USDA failed to afford Licensees' privacy interest in the Box 8 (or 10) information sufficient weight, and gave the alleged public interests in disclosure too much weight, thereby rendering USDA's ultimate balancing of the private and public interests at stake arbitrary and capricious. Accordingly, the District Court should have granted summary judgment in favor of Licensees.

Alternatively, even if this Court finds that summary judgment in favor of Licensees was not warranted, procedural defects in USDA's Exemption 6 evaluation require that this case be remanded to the agency. The agency failed in the privacy interest analysis to explain why it characterized Licensees' privacy interest in their gross revenue information as "limited," and further failed to take into account facts presented by Licensees evidencing how the Box 8 (or 10) information would be used against them. At the same time, USDA deprived Licensees notice of, or an opportunity to be heard regarding, the purported public interests at stake prior to its determination to release this information. For these

11

reasons, at a minimum, this matter should be remanded to the agency for a new Exemption 6 determination in accordance with applicable law.

With respect to Exemption 4, USDA's determination that the release of the Box 8 (or 10) information would not cause Licensees "substantial competitive harm" also is arbitrary and capricious. There can be no doubt that the total number of animals bought and sold by Licensees, and their total gross revenues, is competitive information. Nonetheless, USDA found that HSUS is not a "competitor" of Licensees, and thus concluded that HSUS' use of the information cannot constitute competitive harm.

In this regard, USDA ignored record evidence that HSUS or others could and would use this information to try to destroy Licensees' businesses. USDA erred in not applying Exemption 4 to foreclose dissemination of Licensees' financial information because the use to which it would be put, *i.e.*, destruction of a Licensee's business, unquestionably results in the ultimate "competitive harm." In any event, a Licensee's competitor could use this information for the same purpose. Moreover, USDA was wrong in holding that "similar" Box 8 (or 10) information was already publicly available. For these reasons, USDA's Exemption 4 analysis is arbitrary, capricious and contrary to law. This Court, consequently, should remand this case to the District Court with an order that summary judgment be entered on behalf of Licensees.

12

## ARGUMENT

## I.     STANDARD OF REVIEW

This Court reviews a district court's grant of summary judgment *de novo*. *Consumers' Checkbook Center for the Study of Servs. v. U.S. Dep't of Health & Human Servs.*, 554 F.3d 1046, 1050 (D.C. Cir. 2009) (citation omitted).

In a "reverse-FOIA" case such as this, where an agency determines to release information pursuant to a FOIA request, this Court must make its own determination – separate and apart from the District Court's – whether the agency action was, under the APA, arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law based on its review of the administrative record. *United Techs. Corp. v. U.S. Dep't of Def.*, 601 F.3d 557, 559, 562 (D.C. Cir. 2010). The Court must determine whether the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation omitted). The Court "do[es] not defer to the agency's conclusory or unsupported suppositions." *United Techs.*, 601 F.3d at 562-63 (citation omitted).

Because Licensees moved for summary judgment before the District Court, if they prevail here this Court may remand the case and order the District Court to enter summary judgment in favor of Licensees. *See Nat'l Wildlife Fed'n v. Costle*,

629 F.2d 118, 135-36 (D.C. Cir. 1980) (vacating district court's grant of summary judgment to agency and instructing the court to enter summary judgment in favor of appellant).  Alternatively, in light of USDA's procedural flaws, the Court may order a remand to the agency.  *See Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) ("[I]f the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.").

## II.    THE BOX 8 (OR 10) INFORMATION IS EXEMPT FROM DISCLOSURE UNDER EXEMPTION 6

Exemption 6 exempts from disclosure "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6).  In deciding whether the Exemption applies, the Court first determines whether "disclosure would compromise a substantial, as opposed to a *de minimis*, privacy interest," and, if so, balances that interest against the public interest in disclosure.  *Consumers' Checkbook*, 554 F.3d at 1050 (citations omitted).  Here, Licensees have a substantial, significant privacy interest in their own gross revenue and business volume information.  Moreover, there is <u>no</u> valid public interest in the release of this information.  As a consequence, USDA should not have engaged in any balancing at all.  *See Nat'l Ass'n of Retired Fed. Employees v. Horner*, 879 F.2d

14

873, 879 (D.C. Cir. 1989) ("We have been shown no public interest in ... disclosure . . . We need not linger over the balance; something, even a modest privacy interest, outweighs nothing every time.").  Even if there are public interests at stake, however, USDA's conclusion that they outweigh Licensees' privacy interest is arbitrary and capricious.

### A.    Licensees Have A Substantial Privacy Interest In The Box 8 (Or 10) Information

Licensees unquestionably have a "substantial" privacy interest in both their gross revenue information and business volume information.  This Court "ha[s] consistently held than an individual has a substantial privacy interest under FOIA in his financial information."  *Consumers' Checkbook*, 554 F.3d at 1050 (citations omitted).  This privacy interest extends to "business-related financial information for individually owned or closely-held businesses because the 'financial makeup of the businesses mirrors the financial situation of the individual family members.'" *Id*. at 1051 (quoting *Multi Ag Media LLC v. Dep't of Agric.*, 515 F.3d 1224, 1229 (D.C. Cir. 2008)).  Moreover, this privacy interest encompasses a business's assets, because such information may "allow for an inference to be drawn about the financial situation of [the] individual [owner]."  *Multi Ag*, 515 F.3d at 1230.

The requested financial information "need not reveal completely an individual's personal finances to implicate substantial privacy concerns." *Consumers' Checkbook*, 554 F.3d at 1051.  In *Consumers' Checkbook*, for

example, this Court found a "substantial" privacy interest in the payments received by physicians from Medicare, despite the fact that this information "would not reveal a physician's gross revenue . . . [n]or would it reveal a physician's net income." *Id.* Similarly, this Court found a substantial privacy interest in farmers' "field and crop information," including "a farm's reported acreage and data on the number and width of rows of tobacco," despite the fact that this information would reveal only a "snapshot" of a farmer's finances. *Multi Ag*, 515 F.3d at 1230. Finally, "Congress has also recognized the privacy interest an individual taxpayer has in his tax return information, including the 'nature, source, or amount of his income.'" *Consumers' Checkbook*, 554 F.3d at 1051 (citation omitted).

In this case, the District Court properly held that USDA found a "substantial" – *i.e.*, more than *de minimis* – privacy interest in Licensees' gross revenue and business volume information, *see* Mem. Op. at 13; thus, the existence of a valid, "substantial" privacy interest in the gross revenue and business volume information is well established here. Licensees' gross revenue information is the "source" and "amount of [their] income," *Consumers' Checkbook*, 554 F.3d at 1050 – in fact, for many of the Licensees, this figure is taken directly from the owner's individual tax return.[4] Likewise, Licensees' business volume information

---

[4]    *See, e.g.*, A.R. 002480 ("This is the same information used on our federal taxes . . ."); A.R. 002626 ("As we file a joint tax return this USDA information is reflected on the return  . . ."); A.R. 002664 ("the information contained on form

is the "source" of their income, *Consumers' Checkbook*, 554 F.3d at 1050, and is the sort of business asset information in which the *Multi Ag* court found a substantial privacy interest.  515 F.3d at 1230.  Accordingly, Licensees clearly have a "substantial" privacy interest in the disputed information.

Because Licensees have established a substantial privacy interest in this information, the Court must next evaluate whether any public interests in disclosure exist.

**B.     There Are No Valid Public Interests In Disclosure Of The Box 8 (Or 10) Information**

The District Court found that USDA identified two public interests in disclosure of the gross revenue information, and one public interest in the disclosure of the business volume information.  Mem. Op. at 14-15.  However, both the District Court and USDA erred in accepting the validity of each of the three.

**1.     There Are No Valid Public Interests in Disclosure of the Gross Revenue Information**

The District Court agreed with USDA that there are two public interests in the release of Licensees' gross revenue information:  (1) disclosure would help the public decide whether USDA's fees are "reasonable" and "equitable" in

---

7003, is information that I turn in and use on my tax returns"); A.R. 003429 ("Some of the information that I provided to APHIS on my Form 7003s contains financial information that I included on my Tax Returns"); A.R. 005444 ("I prepared my own Tax Returns for 2008 and 2009 and included the same gross receipts on my Schedule C as I listed on my APHIS forms for 2008 and 2009.").

accordance with USDA's statutory directive, Mem. Op. at 14 (citing A.R. 005530),

17; and (2) disclosure would help the public evaluate whether USDA is properly

assessing and collecting those fees. *Id*. at 14-15 (citing A.R. 005531), 18. Because

neither of these supposed public interests is served by releasing Licensees' private

information, both USDA's and the District Court's opinions must be found

arbitrary and capricious.

> a.    Disclosure of the Gross Revenue Information Will Not
>        Serve the Public's Interest in Determining Whether
>        USDA Fees are Reasonable and Equitable

In its Final Decision, USDA claims that releasing Licensees' gross revenue

information would help the public determine whether the agency's fees are

"reasonable," and are being "adjusted on an equitable basis taking into

consideration the type and nature of the operations to be licensed." A.R. 005531.

USDA's bald statement does not articulate a valid public policy here, because

USDA failed to explain *how* the public could make a determination whether the

fees are "reasonable" and "equitable" based on Licensees' Box 8 (or 10)

information. *Cf. Consumers' Checkbook*, 554 F.3d at 1053 (rejecting purported

public interest where requestor failed to "explain how the requested data can be

used to perform this analysis."). More importantly, disclosure of the disputed

information will not shed any light on whether the fees are "reasonable" or

"equitable." A.R. 005531.

As Licensees argued below, the public ostensibly can determine whether USDA is charging and assessing "reasonable" fees solely by reference to the fee schedule published by USDA in its regulations, 9 C.F.R. § 2.6.  *See* Appellants' Reply In Support of Their Motion for Summary Judgment (Dkt. 55) ("Reply") at 38 ("if the public wants to know whether 'USDA is charging too high a fee for very small facilities,' [as HSUS seems to argue], it can make this determination on the basis of the regulatory fee table alone – no reference to Form 7003 is needed."). That schedule clearly lays out, as the District Court noted, "seven fee categories based on a breeder's gross revenue," Mem. Op. at 17, and any interested party simply can review the schedule to evaluate whether the assessed fees associated with each fee category are "reasonable."  Moreover, to the extent that anyone believes those fees are not reasonable or equitable, their remedy is to petition the agency for a new rulemaking – it is not for the agency to disclose Licensees' private information on Form 7003.  *See* Reply at 37 ("If the public believes that the USDA should 'add new, higher categories of fees' to correct the fact that fee[s] have been increased by only $10 since 1979 . . . then it could petition the agency for a new rulemaking to effect this change.  Nothing in Form 7003 has any bearing on this determination.")

The District Court, however (in the absence of any real explanation of this public interest from USDA itself), impermissibly created a "basis for the agency's

action that the agency itself has not given." *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc*., 419 U.S. 281, 285-86 (1974). Specifically, the District Court found that in order to evaluate "whether the fees are 'reasonable' and set on an 'equitable basis,'" "the public must . . . *know how many breeders fall into each category.*" Mem. Op. at 17 (emphasis added). The District Court went on to explain:

> For example, if most breeders are in the top category (over $100,000) and a substantial portion of them have more than $1,000,000 in revenue, perhaps setting "reasonable" fees on an "equitable basis" requires the USDA to break the top category up to distinguish large from very large breeders.

*Id*.

The District Court's logic is faulty for at least three reasons. First, the public can only know how many breeders fall within each fee category if the public has access to Form 7003 for *every breeder in the country*; a small sample, such as Licensees represent here, tells the public nothing about the makeup of any one of the fee categories. In *Consumers' Checkbook*, for example, this Court rejected a FOIA requester's argument that release of Medicare payment data for certain physicians would "indicate the quality of care Medicare patients are receiving." 554 F.3d at 1052. The Court first disputed the correlation between quantity of procedures performed and quality, but then noted that even if such a correlation existed, "the data [requested] will not indicate total volume because it does not

20

include procedures performed by physicians for non-Medicare patients." *Id*. at 1053.

Here, HSUS' FOIA requests targeted only Missouri breeders and dealers (and a handful of others) – in other words, only a small percentage of the total number of APHIS-licensed breeders and dealers.  The release of Licensees' private information will not help the public understand how many breeders fall into each fee category (and thus arguably understand if USDA is setting "reasonable" fees on an "equitable" basis) because it would only paint a partial picture of the total distribution of fees.

Second, fees usually are collected to defray expenses.  *San Juan Cellular Tel. Co. v. Public Serv. Comm'n of Puerto Rico*, 967 F.2d 683, 685 (1st Cir. 1992). Even if HSUS obtained Box 8 (or 10) information for every licensee in the country, no one could determine the equity and reasonableness of the fees in the absence of information about the expenses those fees are supposed to cover.

Third, and most importantly, the reasonableness and equity of the fee categories established by USDA is a matter of <u>policy</u> based on the statutory directive that USDA "tak[e] into consideration the type and nature of the operations to be licensed."  7 U.S.C. § 2153.  The Final Decision does not discuss what is meant by "type and nature of the operations," and Licensees' (and for that matter, all licensees') gross revenues do not depict the "type and nature" of the

their business.  Because the number of Licensees in each fee category simply bears no correlation to the "type and nature of the operations," contrary to the District Court's reasoning disclosure of Licensees' financial information will not serve the alleged public interest in determining whether the fees are "reasonable" or "equitable."

          b.    <u>Disclosure of the Gross Revenue Information Will Not Serve the Public's Interest in Evaluating Whether USDA is Properly Assessing and Collecting Fees</u>

In its Final Decision, USDA claims, "[m]embers of the public can use the gross dollar amount from regulated activities to analyze whether the agency is properly assessing fees in accordance with its regulations."  A.R. 005531.  In other words, the agency asserts that the public can compare (1) the fee amount listed in the top right corner of Form 7003 with (2) the dollar amount found in Box 8 (or 10) to ensure that USDA is properly collecting the amount of fees due based on the fee categories set out in its regulations, 9 C.F.R. § 2.6.  However, this argument should be rejected for at least four reasons.

First, Licensees dispute the legitimacy of USDA's release of the Form 7003 fee information without Licensees' consent.  *See* Reply at 35, n.25.  *See also* Second Amended Complaint ¶¶ 157-58 (objecting to supposed "routine" release of fee information without Licensees' knowledge); Reply at 26-28 (objecting to May

9, 2012 Memo to File).  Without that fee information, there would be nothing to compare, and thus there could be no valid public interest.

Second, even if the fee amount listed on Form 7003 has been properly released over the years, this amount merely reflects the amount *initially* paid by the Licensee to the agency, and not the actual amount due, or, in the case of an underpayment, the amount ultimately collected by USDA.  *See* Reply at 34-35.

The District Court addressed this second argument, stating that a licensee's underpayment of fees as reported on the Form "does not necessarily mean the USDA has dropped the ball."  Mem. Op. at 18.  The Court reasoned, however, that the public can track whether "dealers who initially underpay still hold active licenses," finding that disclosure of the gross revenue information (coupled with the fee information and a list of active license holders) "will *at least help* the public evaluate whether [USDA] is properly assessing fees."  *Id*. (emphasis added).

To be a valid public interest under FOIA, the public interest furthered by disclosure must actually "serve the core purpose of FOIA, which is *contributing significantly* to public understanding of the operations or activities of the government."  *Id*. at 14 (quoting *U.S. Dep't of Def. v. Fed. Labor Relations Auth.*, 510 U.S. 487, 495 (1994) ("FLRA") (emphasis added).  The District Court's conclusion that disclosure of Licensees' gross revenue information could merely "help" the public determine whether USDA is properly assessing fees, *id*. at 18,

23

falls short of the requirement that the information "contribut[e] *significantly* to public understanding of the operations or activities of the government."   *FLRA*, 510 U.S. at 495 (emphasis added).

Third, USDA never claimed that tracking whether "dealers who initially underpay still hold active licenses," Mem. Op. at 18, constitutes a public interest. Instead, this asserted public interest is the District Court's own invention.  Because the District Court "may not supply a reasoned basis for the agency's action that the agency itself has not given," Mem. Op. at 8 (quoting *Bowman Transp.,* 419 U.S. at 285-86), this interest must be rejected.

Fourth, and finally, even if Licensees' gross revenue information could somehow contribute significantly to the public's knowledge of whether USDA has properly assessed or collected licensing fees, this still could not stand as a valid public interest because there is no evidence that the agency has failed to do its job. In *National Archives and Records Admin. v. Favish*, the Supreme Court held:

> [Where] the public interest being asserted is to show that responsible officials acted negligently or otherwise improperly in the performance of their duties, the requester must establish more than a bare suspicion in order to obtain disclosure. Rather, *the requester must produce evidence that would warrant a belief by a reasonable person that the alleged Government impropriety might have occurred*.

541 U.S. 157, 174 (2004) (emphasis added).  Here, there has been no allegation – much less any evidence in support – that USDA has failed to properly assess or collect licensing fees.  To the contrary, the agency itself proclaims in its Final

24

Decision that when a licensee underpays for its license fee, the agency "has requested that APHIS' Investigative and Enforcement Services investigate . . ." A.R. 005531. Accordingly, absent any evidence that USDA has failed to fulfill its duty of assessing or collecting license fees, there is no public interest in the disclosure of Licensees' gross revenue information.

## 2. There Is No Valid Public Interest in Disclosure of the Business Volume Information

The District Court found that USDA identified one public interest in the release of Licensees' business volume information: "[D]isclosure would help the public gauge the effectiveness of USDA inspections" because "[t]he public – like the inspectors – 'can compare the number of animals reported [in the Forms] to the number of animals viewed at a facility [during inspections].'" Mem. Op. at 14 (citing A.R. 005531). Because this purported "public interest" is neither supported by the record nor logically served by disclosure of Licensees' business volume information, the District Court's reliance on it must be rejected as arbitrary and capricious.

### a. The Record Does Not Support the Argument that the *Public* Can Compare Form 7003 Data With Inspection Report Data

In accepting USDA's asserted public interest in the release of Licensees' business volume information, the District Court improperly found that the *public* could perform the sort of comparisons that, according to the agency's record, only

*experienced APHIS inspectors* are able to do.  The Final Decision states only that APHIS *inspectors* are capable of making any meaningful comparison between the annual business volume data on Form 7003 and the single-day animal numbers reported on the inspections reports, and even then, that the inspectors can only do so "[w]ith experience":

> Inspectors typically have the most current Form 7003 with them as they conduct a facility inspection.  [Inspectors] . . . can compare the number of animals reported to the number of animals viewed at a facility.  With *experience*, an *inspector* can recognize significant discrepancies that might indicate a problem . . .

A.R. 005531 (emphasis added).  USDA's Final Decision relied on the Goldentyer E-mail, which states, in relevant part:

> With *experience* an *inspector* can estimate the number of adult dogs required to produce the number of puppies sold by breed type.Significant discrepancies in the number of animals might indicate that something happened at the facility (disease problem, business changes, etc.) that might be of concern or [sic] of the inspector may not have seen all the regulated animals owned by the licensee.
>
> [Animal Care Inspectors] can also estimate the accuracy of the gross amount reported based on the number of animals bought and sold and the number of animals seen on inspection.

A.R. 005538 (emphasis added).

The District Court held – albeit with no any analysis or explanation – that *the general public* can make these same comparisons:

> The public – like the inspectors – "can compare the number of animals reported [in the Forms] to the number of animals viewed at a facility [during inspections]" . . . The public – like the inspectors – can thus "question the accuracy of the gross amount reported…"

Mem. Op. at 14.  The District Court once again violated its own mandate that it "may not supply a reasoned basis for the agency's action that the agency itself has not given."  Mem. Op. at 8 (quoting *Bowman Transp.,* 419 U.S. at 285-86).  The District Court's reasoning must be rejected.

b.    No Meaningful Comparisons Can Be Drawn Between
      Form 7003 Data and Inspection Report Data

Even if the record, on its face, supported the notion (which it does not) that the *public* could compare Form 7003 and the inspection reports, USDA's conclusion that the business volume data in Form 7003 could help "shed light on the agency's performance of its enforcement duties under the [AWA]," A.R. 005531, should be rejected as arbitrary and capricious.

First – and most significantly – there is no real correlation between the data on the inspection reports and the data on Form 7003.  As Licensees described below, comparing the two sets of data is like "comparing apples and oranges." Reply at 31.  Although the District Court acknowledged Licensees' argument that the Form 7003 information (*i.e.*, the total number of animals bought and sold in a year) will *always* differ from the volume information reported on an inspection report (*i.e.*, the total number of animals observed by an APHIS inspector on one particular day at the Licensee's premises), Mem. Op. at 17-18, it maintained that these numbers are "correlated" in such a way "that *could* advance public

27

monitoring"[5] because "a citizen may reasonably doubt the inspector's diligence" if the two numbers are drastically different but the agency fails to pursue an enforcement action.  *Id.* at 18 (emphasis added).

In the example given by the District Court, in which a licensee reports that she bought and sold 5 dogs in a year while the inspection report shows that there were 100 dogs on the licensee's premises on the inspection day, there simply is no reasonable basis for a citizen to "doubt the inspectors' diligence."  In that example, there can be any number of reasons for the two disparate numbers.  For instance, the breeder might just have started its business at the end of the year, and thus was only able to sell a small number of animals prior to year end.  Alternatively, the breeder might simply have an unsuccessful business.

Second, even to the extent there is some correlation between the numbers, this information does not inform the public whether or not USDA inspectors "appeared to miss," *see* Mem. Op. at 14, any discrepancies between the two.  In other words, the public has no way of knowing from this information alone whether USDA believed there to be a discrepancy between the inspection report volume information and the Form 7003 volume information, and whether USDA

---

[5]     The standard for a public interest is that it "*would* serve the core purpose of FOIA," Mem. Op. at 14 (quoting *FLRA*, 510 U.S. at 495) (emphasis added) – not that it merely "could" serve that purpose.  *See id.* at 18.  Consequently, the District Court's holding that disclosure merely "could" serve the purpose of FOIA is insufficient to satisfy the public interest test here.

did anything to investigate or rectify this discrepancy.  Accordingly, these numbers tell the public nothing about USDA's diligence in its inspection and enforcement activities.

Third, any asserted public interest in evaluating whether USDA is improperly inspecting licensees, or failing to conduct enforcement actions against licensees who misreport their business volume, cannot stand where the record contains no evidence in support of such alleged malfeasance.  As discussed above, *supra* p. 24, a public interest based on an allegation of government misconduct must be supported by "evidence that would warrant a belief by a reasonable person that the alleged Government impropriety might have occurred."  *Favish*, 541 U.S. at 174.  *See also Consumers' Checkbook*, 554 F.3d at 1054 (rejecting requestor's asserted public interest in Exemption 6 analysis because there was not "a scintilla of evidence ... that tends to impugn the integrity of the [government] reports") (quoting *United States Dep't of State v. Ray*, 502 U.S. 164, 179 (1991)).  Here, the record contains no evidence that "[g]overnment impropriety might have occurred," or any evidence that would "impugn the integrity of the [inspection] reports."

In the end, the number of animals bought and sold in a given year by any particular Licensee reveals nothing about "what the[] government is up to." *Consumers' Checkbook*, 554 F.3d at 1059 (citations omitted).  There is no valid public interest in the release of this information.

*     *     *     *

Because "even a modest privacy interest[] outweighs nothing every time," *Horner*, 879 F.2d at 879, the Box 8 (or 10) information is exempt from disclosure under Exemption 6. *See Consumers' Checkbook*, 554 F.3d at 1056 ("we need not balance the non-existent public interest against every physician's substantial privacy interest in the Medicare payments he receives … Accordingly, disclosure of the requested data 'would constitute a clearly unwarranted invasion of personal privacy'") (citing 5 U.S.C. § 552(b)(6)).   Licensees are entitled to summary judgment.

## C.   USDA's Balancing Of The Private And Public Interests Was Erroneous

Even if USDA's purported public interests are legitimate, the agency's balancing of the interests at stake was improper because the agency failed to give sufficient weight to Licensees' privacy interest, and gave too much weight to the public interests.

### 1.   USDA Failed to Give Sufficient Weight to Licensees' Privacy Interest

Clearly, Licensees have a "substantial," or more than *de minimis*, privacy interest in the disputed information. *See supra* pp. 15-17.  Licensees' interest in this information is more than just "substantial" – it is *significant*, and must be accorded considerable weight.  USDA's failure to give Licensees' privacy interest

its due weight renders USDA's balancing of the privacy and public interests factors arbitrary and capricious.

a.    USDA Arbitrarily Diminished Licensees' Privacy
Interest in Their Gross Revenue Information

As part of its balancing test, USDA improperly downgraded the weight of Licensees' privacy interest in their gross revenue information.  The Final Decision claims that Licensees' privacy interest in their gross revenue information was "lessened" by the fact that this information did not reveal Licensees' "net profit after operating expenses and other costs are considered" and thus did "not provide a complete picture of the individual's finances."  A.R. 005529.  As Licensees explained to the District Court, however, this Court has squarely "rejected the notion that a person's privacy interest in his gross revenue is lessened because that number does not reveal net profits."  Reply at 10 (citing *Consumers' Checkbook*, 554 F.3d at 1051 ("the requested information need not reveal completely an individual's personal finances to implicate substantial privacy concerns")).

The District Court discounted *Consumers' Checkbook*, holding that because no public interest was found in that case, "the case provides little guidance on how to weigh the private interest in such revenue information" here.  Mem. Op. at 22. What the District Court missed, however, is that the *Consumers' Checkbook* Court found that the privacy interest that physicians have in the amount of Medicare funds they receive was "significant" for purposes of weighing that interest against

any public interest – even if one did exist.  554 F.3d at 1056.  This, despite the fact

that the payment information would *not reveal* a physician's *net income or even*

*gross revenue*.  *Id*. at 1051.  In other words, *Consumers' Checkbook* gave

"significant" weight to financial information which was even *less* revealing than

the information at issue here (*i.e.*, Licensees' gross revenue), and did not

downgrade that significance simply because the information did not shed light on

an individual's net profits.  USDA's determination that Licensees' gross revenue

information – which is much more revealing than the information at issue in

*Consumers' Checkbook* – was somehow "lessened" simply because it did not

reveal a Licensee's complete financial situation is contrary to clearly established

law.

In fact, as noted above, for many of the Licensees the Box 8 (or 10)

information is the same information reported on these Licensees' tax returns.  *See*

*supra* n. 3.  Licensees undoubtedly have a "significant" privacy interest in this

information, and USDA's failure to accord that interest proper weight renders its

ultimate balancing arbitrary and capricious.

> b.   USDA Arbitrarily Diminished Licensees' Privacy
>      Interest in Their Business Volume Information

USDA characterized Licensees' privacy interest in their business volume

information as "much weaker" than their interest in their gross revenue

information, arbitrarily concluding that "any privacy interest in [the size of a

32

licensee's operation] is negligible." A.R. 005529. The District Court failed to even address the strength of Licensees' privacy interest in this information. *See* Mem. Op. at 21-23. Because Licensees have a very strong interest in their business volume information, this Court must find USDA's balancing arbitrary and capricious.

(1)    *Business Volume Information Sheds Light on the
         Personal Finances of Licensees*

In dismissing Licensees' privacy interest in their business volume data, USDA ignored the slew of comments from breeders and dealers who noted that this information would shed light on their personal finances. *See, e.g.,* A.R. 002483 (referring to Box 8 information as "my financial situation"), 002545 (describing Box 8 information as "personal income"); 002610 ("Raising Dogs is my way of making a living. The Figures in Box 8 are my income ..."). As Licensees argued to the District Court below, the business volume information "allows for a direct correlation to, and revelation of, the licensee's private financial information," and thus should have been given significant weight. Reply at 10.

In *Multi Ag*, this Court held that the release of information pertaining to farmers' assets, including "farm acreage, and the number and width of rows of tobacco and cotton," would "in some cases allow for an inference to be drawn about the financial situation of an individual farmer." 515 F.3d at 1230. In that case, the farmers' privacy interest in their crop data was weakened by two factors,

33

neither of which is present here:  First, the agency had not established that any of the crop data could actually be linked to an individual farmer.  *Id*. at 1229. Second, "common economic variables [such as "weather variability, technological changes, and disease impacts"] weaken the correlation between farm assets and a farmer's financial situation [*i.e*., the volume of these crops the farmer is able to sell each year]."

Here, Form 7003 includes each Licensee's name and address along with their protected information; thus, the link between the information and individual is obvious.  Moreover, the volume of animals bought and sold by each Licensee is expressly stated on Form 7003.  This information – together with each Licensee's gross revenue information – provides a clear picture of that Licensee's finances, without any "variables" (as in *Multi Ag*) to muddy the water.

Because USDA failed to give appropriate consideration to the fact that Licensees' business volume information sheds light on each Licensee's personal finances, the agency's balancing of the private and public interest factors is arbitrary and capricious.

> (2)     *Public Availability of Inspection Report Data Does Not Reduce Licensees' Privacy Interest in Their Business Volume Data*

After improperly characterizing Licensees' privacy interest in their business volume information as "negligible," USDA went on to find that this interest was

34

even further reduced because APHIS' inspection reports, which are posted online and reveal the inventory of animals located on a licensee's premises on a *single* day, "provide[s] some information regarding the size of a licensee's operation." A.R. 005529. This conclusion is arbitrary, capricious and contrary to law for several reasons.

First, the two sets of data (*i.e.*, the business volume information on Form 7003 and the one-day inventory on the inspection report) bear no direct relationship to one another, and thus disclosure of one cannot constitute disclosure of the other. *See* Licensees' Memorandum in Support of its Motion for Summary Judgment (Dkt. 48-1) ("Mem. In Support of Summary Judgment") at 29; Reply at 7-8; *see also supra* pp. 27-28.

Second, Licensees did not voluntarily disclose the inspection report data, such that the release of this data may be considered a waiver of Licensees' privacy rights. *See* Reply at 8-9 (distinguishing *Nation Magazine, Washington Bureau v. U.S. Customs Serv.*, 71 F.3d 885 (D.C. Cir. 1995)).

Third, until its Final Decision, USDA did not reveal that it considered the inspection report data to be so similar to the business volume data so as to constitute a disclosure of the business volume data. *See* A.R. 005529. Thus, Licensees had no opportunity to address at the agency level USDA's contention that the business volume data was already publicly available simply by virtue of

35

the public availability of the inspection report data. Because USDA did not advance this argument until its Final Decision, USDA is precluded from relying on it until Licensees have an opportunity to offer a response at the agency level. *See Occidental Petroleum Corp. v. SEC*, 873 F.2d 325, 342, 347 (D.C. Cir. 1989) (remanding reverse-FOIA case to agency, and placing burden on agency to prove public availability of documents, where plaintiff "had no prior notice" or "opportunity to respond" to agency's argument that plaintiff's private documents were already publicly available).

In any event, even if there is a correlation between the business volume and inspection report data, USDA acted contrary to law by relying upon disclosure of the inventory information contained on an inspection report to justify disclosure of a much broader set of data – *i.e.*, the total number of animals bought and sold by that Licensee over the course of an entire year. Even if the one-day inspection report information "provide[s] *some* information regarding the size of the licensee's operation," A.R. 005529 (emphasis added), that does not warrant full disclosure of the licensee's size itself (*i.e.*, business volume) because "partial disclosure does not alter the privacy interests affected by broader disclosure through FOIA." *Painting & Drywall Work Pres. Fund, Inc. v. HUD,* 936 F.2d 1300, 1303 (D.C. Cir. 1991) (citing *Hopkins v. HUD*, 929 F.2d 81, 87 (2d Cir. 1991)).

36

In *Painting and Drywall*, this Court rejected a FOIA requester's argument that workers' expectation of privacy in their salary information was in any way diminished by the fact that the workers' wage scales were publicly available. 936 F.2d at 1303. Although the wage scales would provide *some* information about the workers' salaries, that did not justify disclosure of the actual salaries themselves. So too here, USDA's "partial disclosure," *Hopkins*, 929 F.2d at 87, of the number of animals a Licensee had on its premises on one particular day cannot diminish the privacy interest that Licensees have in the total number of animals bought and sold in an entire year. Accordingly, the publicly available inspection report data cannot diminish Licensees' strong privacy interest in their business volume data.

### 2.    USDA Gave Too Much Weight to the Purported Public Interests

In addition to giving too little weight to Licensees' privacy interest in the Box 8 (or 10) information, USDA also gave too much weight to the purported public interests in release of the information. Licensees dispute the validity of any of these interests. *See supra* pp. 17-30. Yet even if the asserted public interests are valid and supported by the record, they are too insignificant to outweigh Licensees' significant privacy interest.

a.     USDA Gave Too Much Weight to the Purported Public
Interest Relating to The Assessment and Collection of
Licensing Fees

In its Final Decision, USDA failed to assign any particular strength to the

public interests it claimed were at stake in this case; rather, it merely stated that

"[t]he public's interest in the activities of the agency outweigh the negligible

privacy interest in the number of animals bought and sold and the minimal privacy

interest in the gross dollars earned from regulated activities and the dollars upon

which the fee was based." A.R. 005531. The District Court found that because the

fees collected by the agency implicates the public's interest in "protection of the

public fisc," that interest has "some heft" in the balancing analysis. Mem. Op. at

23.

The District Court ignored, however, that the protection of the public fisc

was also at issue in *Consumers' Checkbook.* *See* 554 F.3d at 1054 (plaintiff

claimed that release of information pertaining to payment of Medicare funds could

be used to determine whether the government was making Medicare payments on

fraudulent claims). Despite the fact that the requested information in that case also

concerned protection of the public fisc (*i.e.*, funds leaving the public fisc in the

form of fraudulently-claimed Medicare payments, as opposed to funds entering the

public fisc in the form of licensing fees), this Court in *Consumers' Checkbook*

found *no* public interest in disclosure because there was no "evidence of alleged

38

fraud the requested data would reveal." *Id*.  Just as there was no evidence in

*Consumers' Checkbook* that the government was giving Medicare funds to

fraudulent claimants, there is no evidence here that USDA has failed to assess or

collect full licensing fees.  To the contrary, the record manifests that in cases where

a licensee underpays for its license, USDA pursues the matter.  A.R. 005531; *see*

*also supra* pp. 27-28.  Thus, the "public fisc" interest here should not be given

much, if any, weight.

        b.    <u>USDA Gave Too Much Weight to the Purported Public</u>
<u>Interest Relating to Inspections and Enforcement Actions</u>

USDA also gave too much weight to the purported public interest in

monitoring USDA's inspections and enforcement activities because, as Licensees

have repeatedly explained, the public cannot draw any meaningful conclusions

from a comparison of (1) the total number of animals a Licensee bought and sold

the previous year, and (2) the number of animals held on a Licensee's property

during one day.  *See, e.g*., Mem. In Support of Summary Judgment at 28-29; Reply

at 31-33; *supra* pp. 24-25.  Any comparison between these types of information is

like comparing apples to oranges, *see* Reply at 31, and thus is distinguishable from

a legitimate public comparison of the types of information involved in *Multi Ag*,

for example.  In *Multi Ag*, this Court recognized that the public could compare two

sets of data that reported the exact same thing – *i.e*., acreage amounts, rows of

tobacco and cotton, etc.  By contrast, the inspection reports and Form 7003 here

involve two distinctly different sets of data.  *See* Reply at 33 (citing *Multi Ag*, 515

F.3d at 1226, 1231).

The District Court rejected Licensees' argument, holding that "*Multi Ag*

*Media* does not set the floor on public interests."  Mem. Op. at 22-23.  But this

misses the point.  Licensees are merely differentiating between the relatively

strong public interests at stake in *Multi Ag* and the weak (if even existent) public

interest asserted here because the public cannot draw any meaningful comparisons

between the public inspection reports and Licensees' private business volume data.

In the end, the asserted public interest here is, at best, "attenuated" and does not

merit much (if any) weight.  *See Painting & Drywall*, 936 F.2d at 1303 (finding

purported public interest in "monitor[ing] enforcement efforts by HUD and the

Department of Labor" "attenuated" and insufficient to outweigh privacy concerns).

c.     Alternative Sources of Information Exist Which
       Diminish the Public Interests

Finally, even if the public interests relating to fees are otherwise valid, those

interests could be served by releasing Form 7003 with Licensees' names,

addresses, and other personal identifiers redacted.  *See* Reply at 42-43.  This Court

has held:

> [O]ne factor agencies and courts consider on the public interest side of
> the equation is the extent to which there are alternative sources of
> information available that could serve the public interest in disclosure.
> Such inquiry proceeds on the logic that *to the extent there are
> "alternative means" available to obtain the information, the need for*

> *enforced disclosure under the FOIA of privacy-implicating information is diminished.*

*U.S. Dep't of Def. Dep't of Military Affairs v. Fed. Labor Relations Auth.*, 964 F.2d 26, 29 (D.C. Cir. 1992) (emphasis added).  Licensees' proposed alternative would allow the public to review the initial fee collected by USDA (located in the top right of Form 7003) in order to (supposedly) determine whether USDA (1) is assessing, charging and collecting "reasonable" fees on an "equitable" basis; and (2) whether the initial fee amount submitted with a licensee's Form 7003 is the amount required by regulation.  The licensee's name is simply irrelevant to the fee assessment and collection analysis.[6]

The District Court properly recognized that the consideration of alternatives is a part of the public interest analysis, *see* Mem. Op. at 20, but rejected Licensees' proposed alternative of redacting names and other personal identifiers from Form 7003.  *Id.* at 21.  First, the District Court implicitly accepted Licensees' argument that this proposed alternative would satisfy the asserted public interests related to fee assessment and collection, but held that the public interest in monitoring USDA's inspection and enforcement activities could not be served because

---

[6]     As Licensees have noted, "the identity of larger dealers, such as Plaintiff Hunte, would likely be obvious from the sales information reported even if their names and addresses were redacted"; thus, Licensees proposed "that, for any such large dealers, USDA simply inform HSUS, by affidavit or otherwise, that the correct fee was assessed and collected from such dealers."  Mem. In Support of Summary Judgment at 38, n.20.

"without a name or address, the public could not cross-reference the Forms with the USDA's databases." *Id*. However, as explained above, there simply is no correlation between these two sets of data, *see supra* pp. 27-28; thus, there is no need for the public to be able to cross-reference Form 7003 with the inspection reports.

Second, the District Court ruled that Licensees waived this proposed alternative because they failed to raise it before the agency. *Id*. But USDA did not disclose the purported public interests until its Final Decision in February 2012, when it decided to release the Box 8 (or 10) information. *Compare* March 2011 Decision (addressing only Exemption 4) *with* Final Decision (introducing Exemption 6 analysis, and listing for the first time alleged public interests in support thereof). Licensees cannot be required to have raised alternatives to satisfy public interests that had not yet been disclosed by USDA. Thus, the District Court's holding that this proposed alternative was waived, Mem. Op. at 21, should be rejected.

*     *     *     *

In sum, USDA's purported public interests in the disclosure of the Box 8 (or 10) data, to the extent they are valid (which Licensees dispute) and merit any weight at all (which Licensees also dispute), simply cannot outweigh Licensees' significant privacy interest in their financial information. Accordingly, USDA's

42

determination that this information was not covered by Exemption 6 is arbitrary and capricious, and Licensees are entitled to summary judgment.

**D.    In The Alternative, Procedural Defects Require A Remand To USDA**

There are procedural flaws in the manner in which USDA conducted the proceedings below.  These flaws lead to the ineluctable conclusion that this Court must remand this case for further proceedings before the agency, in the event that the Court does not find that the District Court itself erred in failing to enter summary judgment in favor of Licensees.

### 1.    USDA's Analysis of Licensees' Privacy Interest Was Defective

USDA's analysis of Licensees' privacy interest in the Box 8 (or 10) information is defective in two respects, each of which merit a remand to the agency for a new determination.

#### a.    USDA Failed to Explain Why Licensees' Privacy Interest in Their Gross Revenue Information Was "Limited"

In its February 16, 2012 Decision Memorandum (issued one day prior to its Final Decision), A.R. 005513-005524, USDA initially found that Licensees have a "strong argument" for their privacy interest in their gross revenue information. A.R. 005516.  Nonetheless, only one paragraph later, USDA re-characterized this interest – without explanation – as "limited."  *Id*.  USDA then further claimed that this privacy interest was "somewhat lessened" by virtue of the fact that the gross

revenue information failed to paint a complete picture of Licensees' finances. *Id*. In the Final Decision, USDA dropped – again without explanation – its initial determination that Licensees have a "strong argument" for their privacy interest in the gross revenue information. A.R. 005529. Instead, it adopted the latter part of its Decision Memorandum, namely, that Licensees have a "limited" and "lessened" privacy interest in this information. *Id*.

USDA's characterization of Licensees' privacy interest in their gross revenue information as "limited" is arbitrary and capricious because this Court has, on multiple occasions, deemed similar financial information not only "substantial" for purposes of deciding whether to engage in the Exemption 6 balancing test, but in fact "*significant*" for purposes of weighing that privacy interest against the public interests in disclosure. *See, e.g*., *Consumers' Checkbook*, 554 F.3d at 1051, 56 (finding that physicians' privacy interest in the total payments they received from Medicare for certain procedures was not only "substantial" (*i.e*., more than *de minimis*), but was in fact "significant"); *Painting & Drywall*, 936 F.2d at 1303 (describing construction workers' privacy interest in their payroll (income) information as "significant").

Here, USDA's failure to proffer any reason for describing such a "significant" privacy interest as merely "limited" – especially where the agency had already described Licensees' interest in this information as "strong"– makes

44

USDA's decision to give Licensees' privacy interest "limited" weight nothing more than a "conclusory . . . supposition[]." *United Techs.*, 601 F.3d at 562-63. USDA's characterization of Licensees' privacy interest in their gross revenue information as "limited" is arbitrary, capricious, and contrary to law, requiring a remand to the agency for further explanation. *See id.* at 564-65 (rejecting agency's "conclusory statement" as to why Exemption 4 did not apply to requested information, and remanding matter back to agency).

        b.      <u>USDA Impermissibly Failed to Consider How Box 8 (or 10) Information Would Be Used in Its Privacy Analysis</u>

USDA's evaluation of Licensees' privacy concerns was also arbitrary, capricious and contrary to law because the agency failed to take into consideration how the Box 8 (or 10) information would be used. The way in which the requested information will be used, and "the consequences likely to ensue" from disclosure, *Horner*, 879 F.2d at 877, are important considerations in the privacy interest analysis. Indeed, "[d]isclosure does not, literally by itself, constitute a harm; it is the requester's (or another's) reaction to the disclosure that can sting." *Id.* at 878.

The agency acknowledged comments from Licensees stating that HSUS had used, and would continue to use, Licensees' personal information to target them for harassment as part of HSUS's "puppy mill" campaign, A.R. 005528, but held that "[i]t is not clear from these comments how the specific information at issue here would contribute to these specific privacy concerns." A.R. 005528-005529.

The District Court acknowledged Licensees' argument that "USDA should have factored the Humane Society's alleged vendetta against Missouri dog dealers into its assessment of the private interests here," but nonetheless found that Licensees "omit the crucial link: they do not explain how the information sought here would further that crusade and cause additional harm to [Licensees]."  Mem. Op. at 21.

The District Court flat out erred.  The record is replete with examples in which Licensees made "the crucial" link between the Box 8 (or 10) data and the invasion of Licensees' privacy interest.  Licensees explained that "HSUS defines 'puppy mills' by scale of operation, *i.e.*, by the number of dogs a breeder or dealer has and the amount of its gross sales with respect to them…"  Mem. In Support of Summary Judgment at 34, n.15.  *See also* A.R. 005438.  Based on that proposition, Licensees further explained that the Box 8 (or 10) data, by revealing a licensee's size and gross revenues, would give HSUS additional ammunition for labeling particular breeders and dealers as "puppy mills":

- "I believe that the HSUS would take this information, and then use the cumulative gross receipts to support an assertion that Breeders in Missouri make millions of dollars based on documentation received from the USDA, and cite that as yet another reason to refer to all Missouri Breeders as greedy Puppy Mills."  A.R. 005148.

- "If APHIS releases the information to the HSUS that it seeks, rest assured that the HSUS will be quoted as stating the following types of words: 'Financial data obtained from the Department of Agriculture has conclusively proven that all Missouri Breeders are puppy mills that need to shamed and

46

driven out business.' In essence, the HSUS did much the same thing when it released its 'Dirty Dozen' List of Missouri Breeders in October of 2010." A.R. 005207.

- "HSUS could use the cumulative amount of gross sales from all USDA Licensed Breeders . . . and mislead the public into believing that documents provided to the HSUS by the U.S. Government conclusively prove that Missouri Breeders are bad, and that no one should buy a puppy that comes from a Missouri Breeder. In short, just as the HSUS misrepresented other documents obtained from APHIS to mischaracterize [Missouri] as being the 'puppy mill capital' of America, it would do the same with the information that it currently seeks." A.R. 005271.

Licensees also presented additional evidence showing that the public stigma of being labeled a "puppy mill" results in significant privacy invasions. For example:

- Some Licensees feared for their own safety, A.R. 004534, 005298, and felt like "prisoners in [their] own home," A.R. 005150, because strangers were found taking photographs of Licensees' homes after licensees were accused of running "puppy mills."

- Another Licensee was faced with a suggestion from a commentator on the Internet that the Licensee "place a pistol in [his] mouth and pull the trigger, merely because [he is] a USDA licensed, commercial breeder in Missouri, also known as the 'puppy mill' capitol." A.R. 005150.

- Yet another Licensee described how, after being falsely identified by HSUS as a "puppy mill," the licensee received "numerous threats to [her] physical safety [and] [her] family's physical safety." A.R. 003654.

In *Horner*, this Court held: "Where there is a substantial probability that disclosure will cause an interference with personal privacy, it matters not that there

may be two or three links in the causal chain." 879 F.2d at 878. As Licensees

demonstrated to the District Court, the likelihood of attacks on Licensees is beyond

a "substantial probability." Reply at 14. That is because HSUS has touted its use

of FOIA to gather information which it then utilizes to target Missouri breeders in

publicity attacks, including through the use of its "Dirty Dozen" lists. *See id.* at 14,

and notes 8 and 9. *See also id.* at 13, n.7 (citing HSUS' "Dirty Dozen" and similar

lists).

Unquestionably, the release of the private information at stake here which

reveals the size of each Licensee's operation, only improves HSUS' (and its

surrogates')[7] ability to target and harass allegedly "large" Licensees by, among

other things, labeling them as "puppy mills."[8] This invites precisely the sort of

"unwanted intrusions" into Licensees' privacy that warrants consideration under

the Exemption 6 privacy analysis. *Horner*, 879 F.2d at 878.[9] USDA's failure to

consider Licensees' concerns about HSUS targeting them, renders the agency's

---

[7]     As this Court held in *Swan v. S.E.C.*, courts "must evaluate the risk of disclosing records to some particular FOIA requester not simply in terms of what the requester might do with the information, but also in terms of what anyone else might do with it." 96 F.3d 498, 500 (D.C. Cir. 1996) (emphasis added).*See also Washington Post Co. v. U.S. Dept. of Agric.*, 943 F.Supp. 31 (D.D.C. 1996) (applying *Swan* in an Exemption 6 analysis).

[8]     *See* Comments of The Hunte Corporation, A.R. 005437, in which Hunte describes a class action lawsuit brought against it by HSUS members alleging that Hunte was a "puppy mill broker."

[9]     In fact, HSUS' intended use of the information is not for mere harassment purposes, but rather is to be used to drive Licensees out of business. *See infra* p. 56.

weighing of Licensees' privacy interest arbitrary and capricious.  The recourse for this failure is a remand to the agency for a new Exemption 6 determination.

### 2.    USDA's Analysis of The Public Interests Was Defective

As the District Court noted, in a "traditional" FOIA case, the requester has the burden of establishing a valid public interest based on the need to monitor the government for impropriety because "there is a presumption of legitimacy accorded to the Government's official conduct."  Mem. Op. at 15 (quoting *Favish*, 541 U.S. at 174).[10]  However, the District Court rejected Licensees' argument that HSUS had the burden of doing so in a "reverse-FOIA" case such as this, holding that this rule "would add nothing but delay."  *Id*. at 16.  According to the District Court, "after dismissal, a FOIA requester could add a single paragraph parroting the interests asserted by the agency and then re-file its request."  *Id*.

Even if a requestor merely "parrot[ed]" back the public interests before re-filing its request, under that circumstance submitters of information (like Licensees here) at least would be given a meaningful opportunity to respond to the purported public interest in the release of their private information.  In reverse-FOIA cases, the submitter of information must be given some "guidance" or "focus" for its response to the proposed disclosure of information.  *Nat'l Org. for Women v.*

---

[10]     Although, as Licensees have noted, "USDA curiously question[ed] its own 'competence' in performing its statutory duties," before the court below, *see* Reply at 40, the agency's *post hoc* attempt to weaken its own credibility cannot serve to undermine the general rule in favor of legitimacy.

*Social Sec. Admin. of Dep't of Health and Human Servs.*, 736 F.2d 727, 746 (D.C. Cir. 1984) (Mikva & McGowan, JJ., concurring).   Ultimately, whether this guidance comes from the requester or the agency is immaterial.  What matters is that a submitter be provided with some focus when formulating its response to an agency's intended release of the submitter's private information.

Here, however, not even the *agency* proffered any public interests in support of disclosure to which Licensees had an opportunity to respond.  Instead, after USDA repeatedly found the Box 8 (or 10) information exempt from disclosure under Exemption 6, *see, e.g*., A.R. 000007-000018; A.R. 000100-000161 (*i.e*., after USDA repeatedly had found that Licensees' substantial privacy interest in the information outweighed the public interests in release, if any), Licensees were blindsided when USDA abruptly reversed its position and determined that there were public interests that outweighed Licensees' substantial privacy interest.  Neither USDA's initial request for comments from Licensees, *see* A.R. 001006-001007, nor its March 2011 Decision, nor its second request for comments from Licensees, *see* A.R. 005075-005076, even hinted at any public interests under Exemption 6 that could justify release of the information – much less give Licensees any "guidance" as to what those public interests might be.

USDA failed to articulate *any* public interests in disclosure until its second determination, *i.e*., the Final Decision, in which it decided to release the

information.  Thus, Licensees had *no* opportunity, prior to the agency's decision to release the contested information, to address any of the public interest arguments ultimately relied upon by USDA in support of its Final Decision.  Such a result simply is unjust.  Licensees must be given "prior notice" and "an opportunity to respond" to arguments in favor of releasing their private information, *Occidental Petroleum Corp.*, 873 F. 2d at 342; without that opportunity, the public interests should be rejected.  *See Taylor Energy Co. LLC v. U.S. Dep't of the Interior*, 734 F.Supp.2d 112, (D.D.C. 2010) (where plaintiff "never had the occasion to present the agency with evidence or argument about the relevance of [certain documents relied upon by agency to justify release of confidential information]," the court "remand[ed] the issue to the agency for further consideration and supplementation of the record as necessary…").

*     *     *     *

In conclusion, should the Court not be persuaded to remand this case to the District Court for the entry of summary judgment in Licensees' favor, it should remand this case to the agency to remedy the procedural flaws discussed above.

## III.   THE BOX 8 (OR 10) INFORMATION IS EXEMPT FROM DISCLOSURE UNDER EXEMPTION 4

Exemption 4 exempts from disclosure "trade secrets and commercial or financial information obtained from a person and privileged or confidential."  5 U.S.C. § 552(b)(4).  There is no dispute that the gross revenue and business

51

volume information is "commercial or financial information obtained from a person." Rather, USDA found – and the District Court agreed – that the Licensees' business volume and gross revenue information was not "confidential" because it would not "cause substantial harm to the competitive position of [Appellants]." Mem. Op. at 8-9 (citation omitted).

Both USDA and the District Court held that, in order to constitute substantial competitive harm, Licensees' *competitors* must be likely to use the Box 8 (or 10) information to cause Licensees harm. *Id*. at 9; A.R. 005532. Thus, in their Exemption 4 analyses, USDA and the District Court ignored the ways in which HSUS would use the information, because it supposedly is not a "competitor" of Licensees. A.R. 005534-005535; Mem. Op. at 10; *see also* HSUS Opposition to Plaintiffs' Motion for Summary Judgment (Dkt. 49) at 19, n.17 ("The HSUS is clearly not competing with Mrs. Lavy to sell puppies."). Additionally, USDA found, and the District Court agreed, that Licensees' competitors likely could not glean much from the disputed information to cause Licensees competitive harm. A.R. 005533-005534; Mem. Op. at 11. USDA and the District Court are wrong on both accounts.

## A.   <u>Non-Competitors Can Cause "Competitive Harm" For Purposes Of Exemption 4</u>

Although Licensees presented substantial evidence that HSUS likely would use Licensees' information to further its crusade to destroy Licensees' businesses,

*see, e.g.*, A.R. 005140 (listing number of ways in which HSUS has tried to defame and destroy dog breeders and dealers), USDA and the District Court ignored this evidence based on the contention that "substantial competitive harm' must "'flow[ ] from the affirmative use of proprietary information by *competitors*."  Mem. Op. at 10 (emphasis in original) (quoting *United Techs.*, 601 F.3d at 563).  USDA concluded, and the District Court agreed, that because HSUS is not a "competitor" of animal breeders and dealers, any attempt by it to destroy Licensees' businesses does not constitute "substantial competitive harm."  A.R. 005535.

*United Technologies*, on which the District Court relied in support of its conclusion that competitive harm requires use of information by competitors, quoted *CNA Financial Corp. v. Donovan*, for this proposition.  601 F.3d at 563 (citing 830 F.2d 1132, 1154 (D.C. Cir. 1987)).  *CNA Financial Corp.*, in turn, quoted *Public Citizen Health Research Group v. FDA*.  830 F.2d 1154, n.158 (quoting 704 F.2d 1280, 1291 n. 30 (D.C. Cir. 1983)).

In a footnote in *Public Citizen*, this Court relied upon a single sentence in a 1981 University of Wisconsin Law Review article to support the "competitors" proposition in contention here.  *See* 704 F.2d at 1291, n.30 (citing Connelly, Secrets and Smokescreens: A Legal and Economic Analysis of Government Disclosures of Business Data, 1981 Wis. L. Rev. 207, 225-26 (1981)) (the "Connelly article").  The Connelly article, however, fails to cite a single authority

in support of its claim that "substantial competitive harm" must flow from use by *competitors*.  1981 Wis. L. Rev. at 235-36.  Furthermore, the author went on to say:

> Competitive harm should not be taken to mean simply any injury to competitive position, as might flow from customer or employee disgruntlement or from the embarrassing publicity attendant upon public revelations concerning for example, illegal or unethical payments to government officials or violations of civil rights, environmental or safety laws.

*Id*.  In other words, by emphasizing that harm must come from competitors, the Connelly article simply attempted to distinguish true competitive harm from mere reputational harm.

A 2010 Columbia Business Law Review article criticized the Connelly article for "cit[ing] no cases or authority for this statement [that "substantial competitive harm" must flow from use by competitors]."  Radez, The Freedom of Information Act Exemption 4:  Protecting Corporate Reputation In the Post-Crash Regulatory Environment, 2010 Colum. Bus. L. Rev. 632, 658 (2010) (the "Radez article").  Indeed, limiting "substantial competitive harm" under Exemption 4 to use of confidential information by competitors makes little sense:  An attempt to destroy someone's business will result in competitive harm to that person no matter *who* is attempting to destroy it.[11]

---

[11]     It also makes no sense to limit analysis of competitive harm based on a competitor vs. a non-competitor requesting the information.  *See* Reply at 50.

In *Nadler v. F.D.I.C.*, for example, then-Judge Mukasey of the U.S. District Court for the Southern District of New York (applying this Circuit's Exemption 4 law) held that release of a joint venture agreement would constitute substantial competitive harm to the joint venture, where the requestors were community groups opposed to the joint venture.   899 F.Supp. 158, 163 (S.D.N.Y. 1995). Rejecting the argument that substantial competitive harm can only result from use by a competitor, Judge Mukasey held:

> [T]he opponents of the joint venture project do not compete with the joint venturers as rival New York City real estate developers. But the economic injury they may inflict on the joint venture is nonetheless a competitive injury. *Plaintiffs' avowed goal is to drive the joint venture out of business. Any financial loss by the joint venture will jeopardize both the venture's relative position vis-a-vis other New York City real estate developers and its solvency.*

*Id.* (emphasis added).  The Court of Appeals for the Second Circuit (also applying D.C. Circuit law) affirmed, holding:  "*The fact that this harm would result from active hindrance by the Plaintiffs rather than directly by potential competitors does not affect the fairness considerations that underlie Exemption Four.* Sensitive financial information about a project of this nature clearly falls within the class of materials that Congress exempted as 'confidential' in section 552(b)(4)." *Nadler v. F.D.I.C.*, 92 F.3d 93, 97 (2d Cir. 1996) (emphasis added).

Licensees have demonstrated how breeders and dealers, especially those with large operations as indicated by their gross revenue and business volume

information, are targeted by HSUS advertising campaigns urging customers not to buy from purported "puppy mills" or others on a "Dirty Dozen list."  *See* Reply at 13 & n.7.  *See also* A.R. 002654 (comment from Licensee explaining, "Given the HSUS's past harassment and bullying tactics this knowledge would allow them to plan how to best force operations like mine out of business. HSUS could choose to focus on forcing the largest operations or those expanding out of business."). These targeted campaigns are aimed at putting Licensees out of business and threaten each Licensee's "relative position vis-à-vis other [breeders and dealers] and  its solvency."  *Nadler*, 899 F.Supp. at 163.  Just as in *Nadler*, HSUS has an "avowed goal . . . to drive [Licensees] out of business."  899 F.Supp. at 163.

In essence, the harm faced by Licensees here by release of the Box 8 (or 10) information – total destruction of their businesses by HSUS' campaigning against purported "puppy mills" – is the *most* significant competitive harm that a Licensee could face or suffer.  *See* Mem. In Support of Summary Judgment at 41; Reply at 49-50.  It is significantly more harmful than the "reputational harm" discussed in the Connelly article.   The competitive harm resulting from HSUS' campaign, which threatens the very existence of Licensees, is no greater or worse than if the campaign had been run by an actual competitor breeder or dealer instead of HSUS.

It simply cannot be that Exemption 4 does not exempt disclosure of confidential information that will be used to *destroy* a business, while it does

exempt disclosure of information which might merely give a competitor some "insights into the strengths and weaknesses" of the company.  *See United Techs.*, 601 F.3d at 564.   In light of the dubious origin of the rule that "substantial competitive harm" must flow from use by "competitors," and especially in light of the anomalous result that stems from this rule, this Court should hold that under the circumstances presented in this case, "substantial competitive harm" under Exemption 4 does *not* require that the harm to Licensees necessarily flow from use of the information by a "competitor."   This Court, therefore, should reverse the District Court and order it to enter summary judgment on Licensees' Exemption 4 claim.

**B.     USDA Arbitrarily Discounted The Harm Licensees Would Suffer By The Release Of The Box 8 (or 10) Information Based On The Public Availability Of Other Information**

USDA held that release of each Licensee's gross revenue would not constitute substantial competitive harm because that information, according to USDA, "is already available":

> The agency routinely releases the amount of fees that it charges a particular business.   That information, combined with USDA's regulations at 9 C.F.R. § 2.6, reveals a range of gross dollar amounts derived from regulated activities.

A.R. 005535.   The agency made a similar argument with respect to Licensee's business volume information in its Decision Memorandum, arguing there would be no competitive harm in the release of this information "because similar information

is already publicly available (number of animals observed during a routine inspection and licensing fees paid)." A.R. 005523.

The District Court agreed, holding:

The fee each dealer pays to renew its license reflects the dealer's revenue from regulated activities, so competitors can already make ballpark estimates of an operation's net income. And annual APHIS inspection reports "show the animal inventory at the time of inspection," so competitors already have some sense of the size and growth of an operation as well.

Mem. Op. at 9 (citations omitted).

The fact that the fees Licensees paid are publicly available[12] cannot be used a stepping stone to release additional, more detailed information about Licensees' finances.   Thus, in *Painting and Drywall*, in the context of an Exemption 6 analysis, this Court rejected the argument that workers' expectation of privacy in their salary information was in any way diminished by the fact that the workers' wage scales were already published.   936 F.2d at 1303.   The same is true of Licensees' business volume information, especially where this supposedly "similar" information already in the public domain (*i.e*., the inspection report inventory) reveals even less about business volume. *See supra* pp. 27-28.

Clearly, USDA inappropriately justifies the release of the information in dispute here based on partial, if otherwise irrelevant, disclosure of other of

---

[12]     Licensees dispute that this information should have been publicly released. *See supra* pp. 22-23.

Licensees' private information.   This renders USDA's ultimate Exemption 4 analysis arbitrary, capricious and contrary to law; as a result, this Court must uphold Licensees' claims that Exemption 4 applies.

## IV.    THE BOX 8 (OR 10) INFORMATION SHOULD BE CATEGORICALLY EXEMPT UNDER FOIA

Should this Court determine that the Box 8 (or 10) information is exempt from disclosure under Exemption 4 or 6, it should hold that this information is categorically exempt from disclosure in the future.  The Box 8 (or 10) information is the same type of information for all USDA licensees, and the same arguments in favor of exempting Licensees' private information from disclosure apply to all other licensees as well.  Therefore, the Box 8 (or 10) information constitutes a "discrete category of exempt information" appropriate for a categorical FOIA exemption.  *See Critical Mass Energy Project v. NRC*, 975 F. 2d 871, 879 (D.C. Cir. 1992) (quotation omitted).

## V.    CONCLUSION

For all the reasons set forth above, the Court should reverse the District Court and remand this case for entry of summary judgment in favor of Licensees. Alternatively, this Court should remand this case to the agency for further proceedings.

Respectfully submitted,

KELLEY DRYE & WARREN LLP

By:   /s/ Ira T. Kasdan

     Ira T. Kasdan
     Laurence J. Lasoff
     Stephen R. Freeland
     Elizabeth C. Johnson

     3050 K Street NW, Ste 400
     Washington, DC 20007
     Tel.: (202) 342-8400
     ikasdan@kelleydrye.com
     llasoff@kelleydrye.com
     sfreeland@kelleydrye.com
     ejohnson@kelleydrye.com

     *Counsel for Appellants*

## CERTIFICATE OF COMPLIANCE

1.       This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,968 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.       This brief complies with the typeface requirements of Fed. R.App. P. 32(a)(5) and the type style requirements of Fed. R. App.P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman, font size 14.

     /s/ Ira T. Kasdan
Ira T. Kasdan
KELLEY DRYE & WARREN LLP
3050 K Street, N.W., Suite 400
Washington, D.C.  20007
(202) 342-8400 (phone)
(202) 342-8451 (facsimile)
Email:  ikasdan@kelleydrye.com

*Counsel  for Appellants*

ADDENDUM

# TABLE OF CONTENTS

1.     5 U.S.C. § 552

2.     7 U.S.C. § 2153

3.     9 C.F.R. § 2.6

5 U.S.C. § 552

Westlaw

▷

**Effective: October 28, 2009**

United States Code Annotated Currentness
  Title 5. Government Organization and Employees (Refs & Annos)
    Part I. The Agencies Generally
      Chapter 5. Administrative Procedure (Refs & Annos)
        Subchapter II. Administrative Procedure (Refs & Annos)
        ➡➡ **§ 552. Public information; agency rules, opinions, orders, records, and proceedings**

**(a)** Each agency shall make available to the public information as follows:

**(1)** Each agency shall separately state and currently publish in the Federal Register for the guidance of the public--

  **(A)** descriptions of its central and field organization and the established places at which, the employees (and in the case of a uniformed service, the members) from whom, and the methods whereby, the public may obtain information, make submittals or requests, or obtain decisions;

  **(B)** statements of the general course and method by which its functions are channeled and determined, including the nature and requirements of all formal and informal procedures available;

  **(C)** rules of procedure, descriptions of forms available or the places at which forms may be obtained, and instructions as to the scope and contents of all papers, reports, or examinations;

  **(D)** substantive rules of general applicability adopted as authorized by law, and statements of general policy or interpretations of general applicability formulated and adopted by the agency; and

  **(E)** each amendment, revision, or repeal of the foregoing.

Except to the extent that a person has actual and timely notice of the terms thereof, a person may not in any manner be required to resort to, or be adversely affected by, a matter required to be published in the Federal Register and not so published. For the purpose of this paragraph, matter reasonably available to the class of persons affected thereby is deemed published in the Federal Register when incorporated by reference therein with the approval of the Director of the Federal Register.

**(2)** Each agency, in accordance with published rules, shall make available for public inspection and copying--

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(A)** final opinions, including concurring and dissenting opinions, as well as orders, made in the adjudication of cases;

**(B)** those statements of policy and interpretations which have been adopted by the agency and are not published in the Federal Register;

**(C)** administrative staff manuals and instructions to staff that affect a member of the public;

**(D)** copies of all records, regardless of form or format, which have been released to any person under paragraph (3) and which, because of the nature of their subject matter, the agency determines have become or are likely to become the subject of subsequent requests for substantially the same records; and

**(E)** a general index of the records referred to under subparagraph (D);

unless the materials are promptly published and copies offered for sale. For records created on or after November 1, 1996, within one year after such date, each agency shall make such records available, including by computer tele-communications or, if computer telecommunications means have not been established by the agency, by other elec-tronic means. To the extent required to prevent a clearly unwarranted invasion of personal privacy, an agency may delete identifying details when it makes available or publishes an opinion, statement of policy, interpretation, staff manual, instruction, or copies of records referred to in subparagraph (D). However, in each case the justification for the deletion shall be explained fully in writing, and the extent of such deletion shall be indicated on the portion of the record which is made available or published, unless including that indication would harm an interest protected by the exemption in subsection (b) under which the deletion is made. If technically feasible, the extent of the deletion shall be indicated at the place in the record where the deletion was made. Each agency shall also maintain and make available for public inspection and copying current indexes providing identifying information for the public as to any matter issued, adopted, or promulgated after July 4, 1967, and required by this paragraph to be made available or published. Each agency shall promptly publish, quarterly or more frequently, and distribute (by sale or otherwise) copies of each index or supplements thereto unless it determines by order published in the Federal Register that the publication would be unnecessary and impracticable, in which case the agency shall nonetheless provide copies of such index on request at a cost not to exceed the direct cost of duplication. Each agency shall make the index referred to in subparagraph (E) available by computer telecommunications by December 31, 1999. A final order, opinion, statement of policy, in-terpretation, or staff manual or instruction that affects a member of the public may be relied on, used, or cited as precedent by an agency against a party other than an agency only if--

**(i)** it has been indexed and either made available or published as provided by this paragraph; or

**(ii)** the party has actual and timely notice of the terms thereof.

**(3)(A)** Except with respect to the records made available under paragraphs (1) and (2) of this subsection, and except as provided in subparagraph (E), each agency, upon any request for records which (i) reasonably describes such records

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

and (ii) is made in accordance with published rules stating the time, place, fees (if any), and procedures to be followed, shall make the records promptly available to any person.

**(B)** In making any record available to a person under this paragraph, an agency shall provide the record in any form or format requested by the person if the record is readily reproducible by the agency in that form or format. Each agency shall make reasonable efforts to maintain its records in forms or formats that are reproducible for purposes of this section.

**(C)** In responding under this paragraph to a request for records, an agency shall make reasonable efforts to search for the records in electronic form or format, except when such efforts would significantly interfere with the operation of the agency's automated information system.

**(D)** For purposes of this paragraph, the term "search" means to review, manually or by automated means, agency records for the purpose of locating those records which are responsive to a request.

**(E)** An agency, or part of an agency, that is an element of the intelligence community (as that term is defined in section 3(4) of the National Security Act of 1947 (50 U.S.C. 401a(4))) shall not make any record available under this paragraph to--

   **(i)** any government entity, other than a State, territory, commonwealth, or district of the United States, or any subdivision thereof; or

   **(ii)** a representative of a government entity described in clause (i).

**(4)(A)(i)** In order to carry out the provisions of this section, each agency shall promulgate regulations, pursuant to notice and receipt of public comment, specifying the schedule of fees applicable to the processing of requests under this section and establishing procedures and guidelines for determining when such fees should be waived or reduced. Such schedule shall conform to the guidelines which shall be promulgated, pursuant to notice and receipt of public comment, by the Director of the Office of Management and Budget and which shall provide for a uniform schedule of fees for all agencies.

**(ii)** Such agency regulations shall provide that--

   **(I)** fees shall be limited to reasonable standard charges for document search, duplication, and review, when records are requested for commercial use;

   **(II)** fees shall be limited to reasonable standard charges for document duplication when records are not sought for commercial use and the request is made by an educational or noncommercial scientific institution, whose purpose is scholarly or scientific research; or a representative of the news media; and

   **(III)** for any request not described in (I) or (II), fees shall be limited to reasonable standard charges for document

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

5 U.S.C.A. § 552

search and duplication.

In this clause, the term "a representative of the news media" means any person or entity that gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience. In this clause, the term "news" means information that is about current events or that would be of current interest to the public. Examples of news-media entities are television or radio stations broadcasting to the public at large and publishers of periodicals (but only if such entities qualify as disseminators of "news") who make their products available for purchase by or subscription by or free distribution to the general public. These examples are not all-inclusive. Moreover, as methods of news delivery evolve (for example, the adoption of the electronic dissemination of newspapers through telecommunications services), such alternative media shall be considered to be news-media entities. A freelance journalist shall be regarded as working for a news-media entity if the journalist can demonstrate a solid basis for expecting publication through that entity, whether or not the journalist is actually employed by the entity. A publication contract would present a solid basis for such an expectation; the Government may also consider the past publication record of the requester in making such a determination.

**(iii)** Documents shall be furnished without any charge or at a charge reduced below the fees established under clause (ii) if disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester.

**(iv)** Fee schedules shall provide for the recovery of only the direct costs of search, duplication, or review. Review costs shall include only the direct costs incurred during the initial examination of a document for the purposes of determining whether the documents must be disclosed under this section and for the purposes of withholding any portions exempt from disclosure under this section. Review costs may not include any costs incurred in resolving issues of law or policy that may be raised in the course of processing a request under this section. No fee may be charged by any agency under this section--

    **(I)** if the costs of routine collection and processing of the fee are likely to equal or exceed the amount of the fee; or

    **(II)** for any request described in clause (ii)(II) or (III) of this subparagraph for the first two hours of search time or for the first one hundred pages of duplication.

**(v)** No agency may require advance payment of any fee unless the requester has previously failed to pay fees in a timely fashion, or the agency has determined that the fee will exceed $250.

**(vi)** Nothing in this subparagraph shall supersede fees chargeable under a statute specifically providing for setting the level of fees for particular types of records.

**(vii)** In any action by a requester regarding the waiver of fees under this section, the court shall determine the matter de novo: *Provided*, That the court's review of the matter shall be limited to the record before the agency.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(viii)** An agency shall not assess search fees (or in the case of a requester described under clause (ii)(II), duplication fees) under this subparagraph if the agency fails to comply with any time limit under paragraph (6), if no unusual or exceptional circumstances (as those terms are defined for purposes of paragraphs (6)(B) and (C), respectively) apply to the processing of the request.

**(B)** On complaint, the district court of the United States in the district in which the complainant resides, or has his principal place of business, or in which the agency records are situated, or in the District of Columbia, has jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant. In such a case the court shall determine the matter de novo, and may examine the contents of such agency records in camera to determine whether such records or any part thereof shall be withheld under any of the exemptions set forth in subsection (b) of this section, and the burden is on the agency to sustain its action. In addition to any other matters to which a court accords substantial weight, a court shall accord substantial weight to an affidavit of an agency concerning the agency's determination as to technical feasibility under paragraph (2)(C) and subsection (b) and reproducibility under paragraph (3)(B).

**(C)** Notwithstanding any other provision of law, the defendant shall serve an answer or otherwise plead to any complaint made under this subsection within thirty days after service upon the defendant of the pleading in which such complaint is made, unless the court otherwise directs for good cause shown.

[**(D)** Repealed. Pub.L. 98-620, Title IV, § 402(2), Nov. 8, 1984, 98 Stat. 3357]

**(E)(i)** The court may assess against the United States reasonable attorney fees and other litigation costs reasonably incurred in any case under this section in which the complainant has substantially prevailed.

**(ii)** For purposes of this subparagraph, a complainant has substantially prevailed if the complainant has obtained relief through either--

  **(I)** a judicial order, or an enforceable written agreement or consent decree; or

  **(II)** a voluntary or unilateral change in position by the agency, if the complainant's claim is not insubstantial.

**(F)(i)** Whenever the court orders the production of any agency records improperly withheld from the complainant and assesses against the United States reasonable attorney fees and other litigation costs, and the court additionally issues a written finding that the circumstances surrounding the withholding raise questions whether agency personnel acted arbitrarily or capriciously with respect to the withholding, the Special Counsel shall promptly initiate a proceeding to determine whether disciplinary action is warranted against the officer or employee who was primarily responsible for the withholding. The Special Counsel, after investigation and consideration of the evidence submitted, shall submit his findings and recommendations to the administrative authority of the agency concerned and shall send copies of the findings and recommendations to the officer or employee or his representative. The administrative authority shall take the corrective action that the Special Counsel recommends.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(ii)** The Attorney General shall--

    **(I)** notify the Special Counsel of each civil action described under the first sentence of clause (i); and

    **(II)** annually submit a report to Congress on the number of such civil actions in the preceding year.

**(iii)** The Special Counsel shall annually submit a report to Congress on the actions taken by the Special Counsel under clause (i).

**(G)** In the event of noncompliance with the order of the court, the district court may punish for contempt the responsible employee, and in the case of a uniformed service, the responsible member.

**(5)** Each agency having more than one member shall maintain and make available for public inspection a record of the final votes of each member in every agency proceeding.

**(6)(A)** Each agency, upon any request for records made under paragraph (1), (2), or (3) of this subsection, shall--

    **(i)** determine within 20 days (excepting Saturdays, Sundays, and legal public holidays) after the receipt of any such request whether to comply with such request and shall immediately notify the person making such request of such determination and the reasons therefor, and of the right of such person to appeal to the head of the agency any adverse determination; and

    **(ii)** make a determination with respect to any appeal within twenty days (excepting Saturdays, Sundays, and legal public holidays) after the receipt of such appeal. If on appeal the denial of the request for records is in whole or in part upheld, the agency shall notify the person making such request of the provisions for judicial review of that determination under paragraph (4) of this subsection.

    The 20-day period under clause (i) shall commence on the date on which the request is first received by the appropriate component of the agency, but in any event not later than ten days after the request is first received by any component of the agency that is designated in the agency's regulations under this section to receive requests under this section. The 20-day period shall not be tolled by the agency except--

    **(I)** that the agency may make one request to the requester for information and toll the 20-day period while it is awaiting such information that it has reasonably requested from the requester under this section; or

    **(II)** if necessary to clarify with the requester issues regarding fee assessment. In either case, the agency's receipt of the requester's response to the agency's request for information or clarification ends the tolling period.

**(B)(i)** In unusual circumstances as specified in this subparagraph, the time limits prescribed in either clause (i) or clause (ii) of subparagraph (A) may be extended by written notice to the person making such request setting forth the unusual circumstances for such extension and the date on which a determination is expected to be dispatched. No

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

such notice shall specify a date that would result in an extension for more than ten working days, except as provided in clause (ii) of this subparagraph.

**(ii)** With respect to a request for which a written notice under clause (i) extends the time limits prescribed under clause (i) of subparagraph (A), the agency shall notify the person making the request if the request cannot be processed within the time limit specified in that clause and shall provide the person an opportunity to limit the scope of the request so that it may be processed within that time limit or an opportunity to arrange with the agency an alternative time frame for processing the request or a modified request. To aid the requester, each agency shall make available its FOIA Public Liaison, who shall assist in the resolution of any disputes between the requester and the agency. Refusal by the person to reasonably modify the request or arrange such an alternative time frame shall be considered as a factor in determining whether exceptional circumstances exist for purposes of subparagraph (C).

**(iii)** As used in this subparagraph, "unusual circumstances" means, but only to the extent reasonably necessary to the proper processing of the particular requests--

    **(I)** the need to search for and collect the requested records from field facilities or other establishments that are separate from the office processing the request;

    **(II)** the need to search for, collect, and appropriately examine a voluminous amount of separate and distinct records which are demanded in a single request; or

    **(III)** the need for consultation, which shall be conducted with all practicable speed, with another agency having a substantial interest in the determination of the request or among two or more components of the agency having substantial subject-matter interest therein.

**(iv)** Each agency may promulgate regulations, pursuant to notice and receipt of public comment, providing for the aggregation of certain requests by the same requestor, or by a group of requestors acting in concert, if the agency reasonably believes that such requests actually constitute a single request, which would otherwise satisfy the unusual circumstances specified in this subparagraph, and the requests involve clearly related matters. Multiple requests involving unrelated matters shall not be aggregated.

**(C)(i)** Any person making a request to any agency for records under paragraph (1), (2), or (3) of this subsection shall be deemed to have exhausted his administrative remedies with respect to such request if the agency fails to comply with the applicable time limit provisions of this paragraph. If the Government can show exceptional circumstances exist and that the agency is exercising due diligence in responding to the request, the court may retain jurisdiction and allow the agency additional time to complete its review of the records. Upon any determination by an agency to comply with a request for records, the records shall be made promptly available to such person making such request. Any notification of denial of any request for records under this subsection shall set forth the names and titles or positions of each person responsible for the denial of such request.

**(ii)** For purposes of this subparagraph, the term "exceptional circumstances" does not include a delay that results from a predictable agency workload of requests under this section, unless the agency demonstrates reasonable

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

progress in reducing its backlog of pending requests.

**(iii)** Refusal by a person to reasonably modify the scope of a request or arrange an alternative time frame for processing a request (or a modified request) under clause (ii) after being given an opportunity to do so by the agency to whom the person made the request shall be considered as a factor in determining whether exceptional circumstances exist for purposes of this subparagraph.

**(D)(i)** Each agency may promulgate regulations, pursuant to notice and receipt of public comment, providing for multitrack processing of requests for records based on the amount of work or time (or both) involved in processing requests.

**(ii)** Regulations under this subparagraph may provide a person making a request that does not qualify for the fastest multitrack processing an opportunity to limit the scope of the request in order to qualify for faster processing.

**(iii)** This subparagraph shall not be considered to affect the requirement under subparagraph (C) to exercise due diligence.

**(E)(i)** Each agency shall promulgate regulations, pursuant to notice and receipt of public comment, providing for expedited processing of requests for records--

    **(I)** in cases in which the person requesting the records demonstrates a compelling need; and

    **(II)** in other cases determined by the agency.

**(ii)** Notwithstanding clause (i), regulations under this subparagraph must ensure--

    **(I)** that a determination of whether to provide expedited processing shall be made, and notice of the determination shall be provided to the person making the request, within 10 days after the date of the request; and

    **(II)** expeditious consideration of administrative appeals of such determinations of whether to provide expedited processing.

**(iii)** An agency shall process as soon as practicable any request for records to which the agency has granted expedited processing under this subparagraph. Agency action to deny or affirm denial of a request for expedited processing pursuant to this subparagraph, and failure by an agency to respond in a timely manner to such a request shall be subject to judicial review under paragraph (4), except that the judicial review shall be based on the record before the agency at the time of the determination.

**(iv)** A district court of the United States shall not have jurisdiction to review an agency denial of expedited processing of a request for records after the agency has provided a complete response to the request.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(v)** For purposes of this subparagraph, the term "compelling need" means--

**(I)** that a failure to obtain requested records on an expedited basis under this paragraph could reasonably be expected to pose an imminent threat to the life or physical safety of an individual; or

**(II)** with respect to a request made by a person primarily engaged in disseminating information, urgency to inform the public concerning actual or alleged Federal Government activity.

**(vi)** A demonstration of a compelling need by a person making a request for expedited processing shall be made by a statement certified by such person to be true and correct to the best of such person's knowledge and belief.

**(F)** In denying a request for records, in whole or in part, an agency shall make a reasonable effort to estimate the volume of any requested matter the provision of which is denied, and shall provide any such estimate to the person making the request, unless providing such estimate would harm an interest protected by the exemption in subsection (b) pursuant to which the denial is made.

**(7)** Each agency shall--

**(A)** establish a system to assign an individualized tracking number for each request received that will take longer than ten days to process and provide to each person making a request the tracking number assigned to the request; and

**(B)** establish a telephone line or Internet service that provides information about the status of a request to the person making the request using the assigned tracking number, including--

**(i)** the date on which the agency originally received the request; and

**(ii)** an estimated date on which the agency will complete action on the request.

**(b)** This section does not apply to matters that are--

**(1)** (A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order;

**(2)** related solely to the internal personnel rules and practices of an agency;

**(3)** specifically exempted from disclosure by statute (other than section 552b of this title), if that statute--

**(A)(i)** requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(ii)** establishes particular criteria for withholding or refers to particular types of matters to be withheld; and

**(B)** if enacted after the date of enactment of the OPEN FOIA Act of 2009, specifically cites to this paragraph.

**(4)** trade secrets and commercial or financial information obtained from a person and privileged or confidential;

**(5)** inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency;

**(6)** personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy;

**(7)** records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information (A) could reasonably be expected to interfere with enforcement proceedings, (B) would deprive a person of a right to a fair trial or an impartial adjudication, (C) could reasonably be expected to constitute an unwarranted invasion of personal privacy, (D) could reasonably be expected to disclose the identity of a confidential source, including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of a record or information compiled by criminal law enforcement authority in the course of a criminal investigation or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source, (E) would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law, or (F) could reasonably be expected to endanger the life or physical safety of any individual;

**(8)** contained in or related to examination, operating, or condition reports prepared by, on behalf of, or for the use of an agency responsible for the regulation or supervision of financial institutions; or

**(9)** geological and geophysical information and data, including maps, concerning wells.

Any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection. The amount of information deleted, and the exemption under which the deletion is made, shall be indicated on the released portion of the record, unless including that indication would harm an interest protected by the exemption in this subsection under which the deletion is made. If technically feasible, the amount of the information deleted, and the exemption under which the deletion is made, shall be indicated at the place in the record where such deletion is made.

**(c)(1)** Whenever a request is made which involves access to records described in subsection (b)(7)(A) and--

**(A)** the investigation or proceeding involves a possible violation of criminal law; and

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(B)** there is reason to believe that (i) the subject of the investigation or proceeding is not aware of its pendency, and (ii) disclosure of the existence of the records could reasonably be expected to interfere with enforcement proceedings,

the agency may, during only such time as that circumstance continues, treat the records as not subject to the requirements of this section.

**(2)** Whenever informant records maintained by a criminal law enforcement agency under an informant's name or personal identifier are requested by a third party according to the informant's name or personal identifier, the agency may treat the records as not subject to the requirements of this section unless the informant's status as an informant has been officially confirmed.

**(3)** Whenever a request is made which involves access to records maintained by the Federal Bureau of Investigation pertaining to foreign intelligence or counterintelligence, or international terrorism, and the existence of the records is classified information as provided in subsection (b)(1), the Bureau may, as long as the existence of the records remains classified information, treat the records as not subject to the requirements of this section.

**(d)** This section does not authorize withholding of information or limit the availability of records to the public, except as specifically stated in this section. This section is not authority to withhold information from Congress.

**(e)(1)** On or before February 1 of each year, each agency shall submit to the Attorney General of the United States a report which shall cover the preceding fiscal year and which shall include--

**(A)** the number of determinations made by the agency not to comply with requests for records made to such agency under subsection (a) and the reasons for each such determination;

**(B)(i)** the number of appeals made by persons under subsection (a)(6), the result of such appeals, and the reason for the action upon each appeal that results in a denial of information; and

**(ii)** a complete list of all statutes that the agency relies upon to authorize the agency to withhold information under subsection (b)(3), the number of occasions on which each statute was relied upon, a description of whether a court has upheld the decision of the agency to withhold information under each such statute, and a concise description of the scope of any information withheld;

**(C)** the number of requests for records pending before the agency as of September 30 of the preceding year, and the median and average number of days that such requests had been pending before the agency as of that date;

**(D)** the number of requests for records received by the agency and the number of requests which the agency processed;

**(E)** the median number of days taken by the agency to process different types of requests, based on the date on

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

which the requests were received by the agency;

**(F)** the average number of days for the agency to respond to a request beginning on the date on which the request was received by the agency, the median number of days for the agency to respond to such requests, and the range in number of days for the agency to respond to such requests;

**(G)** based on the number of business days that have elapsed since each request was originally received by the agency--

    **(i)** the number of requests for records to which the agency has responded with a determination within a period up to and including 20 days, and in 20-day increments up to and including 200 days;

    **(ii)** the number of requests for records to which the agency has responded with a determination within a period greater than 200 days and less than 301 days;

    **(iii)** the number of requests for records to which the agency has responded with a determination within a period greater than 300 days and less than 401 days; and

    **(iv)** the number of requests for records to which the agency has responded with a determination within a period greater than 400 days;

**(H)** the average number of days for the agency to provide the granted information beginning on the date on which the request was originally filed, the median number of days for the agency to provide the granted information, and the range in number of days for the agency to provide the granted information;

**(I)** the median and average number of days for the agency to respond to administrative appeals based on the date on which the appeals originally were received by the agency, the highest number of business days taken by the agency to respond to an administrative appeal, and the lowest number of business days taken by the agency to respond to an administrative appeal;

**(J)** data on the 10 active requests with the earliest filing dates pending at each agency, including the amount of time that has elapsed since each request was originally received by the agency;

**(K)** data on the 10 active administrative appeals with the earliest filing dates pending before the agency as of September 30 of the preceding year, including the number of business days that have elapsed since the requests were originally received by the agency;

**(L)** the number of expedited review requests that are granted and denied, the average and median number of days for adjudicating expedited review requests, and the number adjudicated within the required 10 days;

**(M)** the number of fee waiver requests that are granted and denied, and the average and median number of days for

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

adjudicating fee waiver determinations;

(N) the total amount of fees collected by the agency for processing requests; and

(O) the number of full-time staff of the agency devoted to processing requests for records under this section, and the total amount expended by the agency for processing such requests.

(2) Information in each report submitted under paragraph (1) shall be expressed in terms of each principal component of the agency and for the agency overall.

(3) Each agency shall make each such report available to the public including by computer telecommunications, or if computer telecommunications means have not been established by the agency, by other electronic means. In addition, each agency shall make the raw statistical data used in its reports available electronically to the public upon request.

(4) The Attorney General of the United States shall make each report which has been made available by electronic means available at a single electronic access point. The Attorney General of the United States shall notify the Chairman and ranking minority member of the Committee on Government Reform and Oversight of the House of Representatives and the Chairman and ranking minority member of the Committees on Governmental Affairs and the Judiciary of the Senate, no later than April 1 of the year in which each such report is issued, that such reports are available by electronic means.

(5) The Attorney General of the United States, in consultation with the Director of the Office of Management and Budget, shall develop reporting and performance guidelines in connection with reports required by this subsection by October 1, 1997, and may establish additional requirements for such reports as the Attorney General determines may be useful.

(6) The Attorney General of the United States shall submit an annual report on or before April 1 of each calendar year which shall include for the prior calendar year a listing of the number of cases arising under this section, the exemption involved in each case, the disposition of such case, and the cost, fees, and penalties assessed under subparagraphs (E), (F), and (G) of subsection (a)(4). Such report shall also include a description of the efforts undertaken by the Department of Justice to encourage agency compliance with this section.

(f) For purposes of this section, the term--

(1) "agency" as defined in section 551(1) of this title includes any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government (including the Executive Office of the President), or any independent regulatory agency; and

(2) "record" and any other term used in this section in reference to information includes--

(A) any information that would be an agency record subject to the requirements of this section when maintained

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

by an agency in any format, including an electronic format; and

**(B)** any information described under subparagraph (A) that is maintained for an agency by an entity under Government contract, for the purposes of records management.

**(g)** The head of each agency shall prepare and make publicly available upon request, reference material or a guide for requesting records or information from the agency, subject to the exemptions in subsection (b), including--

**(1)** an index of all major information systems of the agency;

**(2)** a description of major information and record locator systems maintained by the agency; and

**(3)** a handbook for obtaining various types and categories of public information from the agency pursuant to chapter 35 of title 44, and under this section.

**(h)(1)** There is established the Office of Government Information Services within the National Archives and Records Administration.

**(2)** The Office of Government Information Services shall--

**(A)** review policies and procedures of administrative agencies under this section;

**(B)** review compliance with this section by administrative agencies; and

**(C)** recommend policy changes to Congress and the President to improve the administration of this section.

**(3)** The Office of Government Information Services shall offer mediation services to resolve disputes between persons making requests under this section and administrative agencies as a non-exclusive alternative to litigation and, at the discretion of the Office, may issue advisory opinions if mediation has not resolved the dispute.

**(i)** The Government Accountability Office shall conduct audits of administrative agencies on the implementation of this section and issue reports detailing the results of such audits.

**(j)** Each agency shall designate a Chief FOIA Officer who shall be a senior official of such agency (at the Assistant Secretary or equivalent level).

**(k)** The Chief FOIA Officer of each agency shall, subject to the authority of the head of the agency--

**(1)** have agency-wide responsibility for efficient and appropriate compliance with this section;

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(2)** monitor implementation of this section throughout the agency and keep the head of the agency, the chief legal officer of the agency, and the Attorney General appropriately informed of the agency's performance in implementing this section;

**(3)** recommend to the head of the agency such adjustments to agency practices, policies, personnel, and funding as may be necessary to improve its implementation of this section;

**(4)** review and report to the Attorney General, through the head of the agency, at such times and in such formats as the Attorney General may direct, on the agency's performance in implementing this section;

**(5)** facilitate public understanding of the purposes of the statutory exemptions of this section by including concise descriptions of the exemptions in both the agency's handbook issued under subsection (g), and the agency's annual report on this section, and by providing an overview, where appropriate, of certain general categories of agency records to which those exemptions apply; and

**(6)** designate one or more FOIA Public Liaisons.

**(l)** FOIA Public Liaisons shall report to the agency Chief FOIA Officer and shall serve as supervisory officials to whom a requester under this section can raise concerns about the service the requester has received from the FOIA Requester Center, following an initial response from the FOIA Requester Center Staff. FOIA Public Liaisons shall be responsible for assisting in reducing delays, increasing transparency and understanding of the status of requests, and assisting in the resolution of disputes.

CREDIT(S)

(Pub.L. 89-554, Sept. 6, 1966, 80 Stat. 383; Pub.L. 90-23, § 1, June 5, 1967, 81 Stat. 54; Pub.L. 93-502, §§ 1 to 3, Nov. 21, 1974, 88 Stat. 1561 to 1564; Pub.L. 94-409, § 5(b), Sept. 13, 1976, 90 Stat. 1247; Pub.L. 95-454, Title IX, § 906(a)(10), Oct. 13, 1978, 92 Stat. 1225; Pub.L. 98-620, Title IV, § 402(2), Nov. 8, 1984, 98 Stat. 3357; Pub.L. 99-570, Title I, §§ 1802, 1803, Oct. 27, 1986, 100 Stat. 3207-48, 3207-49; Pub.L. 104-231, §§ 3 to 11, Oct. 2, 1996, 110 Stat. 3049 to 3054; Pub.L. 107-306, Title III, § 312, Nov. 27, 2002, 116 Stat. 2390; Pub.L. 110-175, §§ 3, 4(a), 5, 6(a)(1), (b)(1), 7(a), 8 to 10(a), 12, Dec. 31, 2007, 121 Stat. 2525 to 2530; Pub.L. 111-83, Title V, § 564(b), Oct. 28, 2009, 123 Stat. 2184.)

Current through P.L. 113-12 (excluding P.L. 113-4) approved 6-3-13

Westlaw. (C) 2013 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

7 U.S.C. § 2153

Westlaw.

7 U.S.C.A. § 2153                                                                                    Page 1

C

**Effective:[See Text Amendments]**

United States Code Annotated Currentness
  Title 7. Agriculture
    Chapter 54. Transportation, Sale, and Handling of Certain Animals (Refs & Annos)
    ➡➡ **§ 2153. Fees and authorization of appropriations**

The Secretary shall charge, assess, and cause to be collected reasonable fees for licenses issued. Such fees shall be adjusted on an equitable basis taking into consideration the type and nature of the operations to be licensed and shall be deposited and covered into the Treasury as miscellaneous receipts. There are hereby authorized to be appropriated such funds as Congress may from time to time provide: *Provided*, That there is authorized to be appropriated to the Secretary of Agriculture for enforcement by the Department of Agriculture of the provisions of section 2156 of this title an amount not to exceed $100,000 for the transition quarter ending September 30, 1976, and not to exceed $400,000 for each fiscal year thereafter.

CREDIT(S)

(Pub.L. 89-544, § 23, Aug. 24, 1966, 80 Stat. 353; Pub.L. 94-279, § 18, Apr. 22, 1976, 90 Stat. 423.)

Current through P.L. 113-12 (excluding P.L. 113-4) approved 6-3-13

Westlaw. (C) 2013 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

9 C.F.R. § 2.6

9 C.F.R. § 2.6                                                                                          Page 1

**C**

**Effective:[See Text Amendments]**

Code of Federal Regulations Currentness
    Title 9. Animals and Animal Products
        Chapter I. Animal and Plant Health Inspection Service, Department of Agriculture
            Subchapter A. Animal Welfare
                Part 2. Regulations (Refs & Annos)
                    Subpart A. Licensing
                        ➡ § 2.6 Annual license fees.

(a) For an initial license, the applicant must submit a $10 application fee in addition to the initial license fee prescribed in this section. Licensees applying for license renewal or changed class of license must submit only the license fee prescribed in this section. The license fee for an initial license, license renewal, or changed class of license is determined from table 1 or 2 in paragraph (c) of this section. Paragraph (b) of this section indicates the method used to calculate the license fee. All initial license and changed class of license fees must be submitted to the appropriate Animal Care regional office, and, in the case of license renewals, all fees must be received by the appropriate Animal Care regional office on or before the expiration date of the license.

(b)(1) Class "A" license. The annual license renewal fee for a Class "A" dealer shall be based on 50 percent of the total gross amount, expressed in dollars, derived from the sale of animals to research facilities, dealers, exhibitors, retail pet stores, and persons for use as pets, directly or through an auction sale, by the dealer or applicant during his or her preceding business year (calendar or fiscal) in the case of a person who operated during such a year. If animals are leased, the lessor shall pay a fee based on 50 percent of any compensation received from the leased animals and the lessee shall pay a fee based upon the net

compensation received from the leased animals, as indicated for dealers in Table 1 in paragraph (c) of this section.

(2) Class "B" license. The annual license renewal fee for a Class "B" dealer shall be established by calculating the total amount received from the sale of animals to research facilities, dealers, exhibitors, retail pet stores, and persons for use as pets, directly or through an auction sale, during the preceding business year (calendar or fiscal) less the amount paid for the animals by the dealer or applicant. This net difference, exclusive of other costs, shall be the figure used to determine the license fee of a Class "B" dealer. If animals are leased, the lessor and lessee shall each pay a fee based on the net compensation received from the leased animals calculated from Table 1 in paragraph (c) of this section.

(3) The annual license renewal fee for a broker or operator of an auction sale shall be that of a class "B" dealer and shall be based on the total gross amount, expressed in dollars, derived from commissions or fees charged for the sale of animals, or for negotiating the sale of animals, by brokers or by the operator of an auction sale, to research facilities, dealers, exhibitors, retail pet stores, and persons for use as pets, during the preceding business year (calendar or fiscal).

(4) In the case of a new applicant for a license as a dealer, broker or operator of an auction sale who did not operate during a preceding business year, the annual license fee will be based on the anticipated yearly dollar amount of business, as provided in paragraphs (b)(1), (2), and (3) of this section, derived from the sale of animals to research facilities, dealers, exhibitors, retail pet stores, and persons for use as pets, directly or through an auction sale.

(5) The amount of the annual fee to be paid upon application for a class "C" license as an exhibitor under

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

this section shall be based on the number of animals which the exhibitor owned, held, or exhibited at the time the application is signed and dated or during the previous year, whichever is greater, and will be the amount listed in Table 2 in paragraph (c) of this section. Animals which are leased shall be included in the number of animals being held by both the lessor and the lessee when calculating the annual fee. An exhibitor shall pay his or her annual license fee on or before the expiration date of the license and the fee shall be based on the number of animals which the exhibitor is holding or has held during the year (both owned and leased).

(c) The license fee shall be computed in accordance with the following tables:

| Table 1.--Dealers, Brokers, and Operators of an Auction Sale--Class "A" and "B" License | | | |
|---|---|---|---|
| Over | But not over | Initial license fee | Annual or changed class of license fee |
| $0 | $500 | $30 | $40 |
| 500 | 2,000 | 60 | 70 |
| 2,000 | 10,000 | 120 | 130 |
| 10,000 | 25,000 | 225 | 235 |
| 25,000 | 50,000 | 350 | 360 |
| 50,000 | 100,000 | 475 | 485 |
| 100,000 | | 750 | 760 |

| Table 2.--Exhibitors--Class "C" License | | |
|---|---|---|
| Number of animals | Initial license fee | Annual or changed class of license fee |
| 1 to 5 | $30 | $40 |
| 6 to 25 | 75 | 85 |
| 26 to 50 | 175 | 185 |
| 51 to 500 | 225 | 235 |
| 501 and up | 300 | 310 |

(d) If a person meets the licensing requirements for more than one class of license, he shall be required to obtain a license and pay the fee for the type business which is predominant for his operation, as determined by the Secretary.

(e) In any situation in which a licensee shall have demonstrated in writing to the satisfaction of the Secretary that he or she has good reason to believe that the dollar amount of his or her business for the forthcoming business year will be less than the previous business year, then his or her estimated dollar amount of business shall be used for computing the license fee for the forthcoming business year: Provided, however, That if the dollar amount upon which the license fee is based for that year does in fact exceed the amount estimated, the difference in amount of the fee paid and that which was due under paragraphs (b) and (c) of this section based upon the actual dollar business upon which the license fee is based, shall be payable in addition to the required annual license fee for the next subsequent year, on the anniversary date of his or her license as prescribed in this section.

[63 FR 62926, Nov. 10, 1998; 69 FR 42101, July 14, 2004]

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

SOURCE: 54 FR 36147, Aug. 31, 1989; 58 FR 39129, July 22, 1993; 60 FR 64115, Dec. 14, 1995; 66 FR 239, Jan. 3, 2001; 66 FR 21061, April 27, 2001, unless otherwise noted.

AUTHORITY: 7 U.S.C. 2131–2159; 7 CFR 2.22, 2.80, and 371.7.

9 C. F. R. § 2.6, 9 CFR § 2.6

Current through June 13, 2013; 78 FR 35573.

© 2013 Thomson Reuters.
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 20, 2013, I caused to be electronically filed with the Clerk of the Court the foregoing Appellants' Brief using the CM/ECF system, and service was effected electronically on the following counsel of record:

Alan Burch
Craig Lawrence
U.S. Attorney's Office
(USA) Civil Division
555 4th Street, N.W.
Washington, D.C. 20530

Aaron D. Green
Jonathan R. Lovvorn
THE HUMANE SOCIETY OF
  THE UNITED STATES
2100 L Street, N.W.
Washington, D.C. 20037

*Counsel for Appellee*

*Counsel for Appellee*

UNITED STATES
  DEPARTMENT
  OF AGRICULTURE

THE HUMANE SOCIETY OF
  THE UNITED STATES

    /s/ Ira T. Kasdan
Ira T. Kasdan
KELLEY DRYE & WARREN LLP
3050 K Street, N.W., Suite 400
Washington, D.C.  20007
(202) 342-8400 (phone)
(202) 342-8451 (facsimile)
Email:  ikasdan@kelleydrye.com

*Counsel  for Appellants*